UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                  :

MARITZA MALDONADO,              :

                                :

          Plaintiff,             :

        -v.-                   :     16-CV-165 (JLC)

                                :

NANCY A. BERRYHILL,[1]       :
Acting Commissioner of Social Security   :

                                :

          Defendant.       :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/10/17

## OPINION AND ORDER

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Berryhill is hereby substituted for former Acting Commissioner Carolyn W. Colvin as the defendant in this action.

# TABLE OF CONTENTS

I. BACKGROUND ..................................................................................1

    A.    Procedural History ...................................................................1

    B.    The Administrative Record ....................................................3

          1.    Maldonado's Background ................................................3

          2.    Medical Evidence in the Record ....................................5
              a.    Medical History .......................................5
                  i.    Asthma ...........................................5
                  ii.    Bariatric Surgery ...........................5
                  iii.  Dr. Marguerite Bernard – Primary Care Physician ...6
                  iv.  Catskill Pain Management Clinic...............................7
              b.    Physician's Assessments ...................................11
                  i.    Dr. Arlene Tieng – Treating Rheumatologist............11
                  ii.    Dr. Catherine Pelczar-Wissner – Internal Medical Consultative Examiner...............................13
                  iii.  Dr. Iqbal Teli – Internal Medical Consultative Examiner....................................15
              c.    Physicians' Assessments – Mental Impairments.............17
                  i.    Dr. Richard Frenkel – Treating Psychiatrist ............17
                  ii.    Dr. John Spiegel – Treating Psychiatrist ..................18
                  iii.  Shelbi Simmons, LCSW – Treating Psychotherapist .........................................19
                  iv.  Dr. David Mahony – Psychiatric Consultative Examiner.....................................21
                  v.    Dr. Alexander Alerte – Psychiatric Consultative Examiner.....................................23
                  vi.  Dr. M. Apacible – Psychiatric Consultative Examiner.....................................24

    C.    Hearings Before the ALJ ......................................................25

          1.    Medical Expert Testimony – Dr. Bernard Gussoff ....................25

          2.    Vocational Expert Testimony – Mr. Michael Smith...................27

II.      DISCUSSION.............................................................................28

  A.    Standard of Review.................................................................28

       1.    Judicial Review of the Commissioner's Determination.............28

       2.    Commissioner's Determination of Disability ..............................30
            a.    Five-Step Inquiry...............................................31
            b.    Duty to Develop the Record ...............................32
            c.    Treating Physician's Rule .................................33
            d.    Claimant's Credibility ......................................37

  B.    The ALJ's Decision...............................................................38

  C.    Analysis .................................................................................48

       1.    The ALJ properly evaluated Maldonado's fibromyalgia as part of the five-step sequential evaluation process. ...............................50
            a.    Maldonado's assertion that the ALJ did not find a medically determinable impairment of fibromyalgia is moot.................................................................................52
            b.    The ALJ's finding that Maldonado has a medically determinable impairment of fibromyalgia does not render her *per se* disabled. ........................................52
            c.    The ALJ considered Maldonado's fibromyalgia in conjunction with other impairments at Step Three.........53
            d.    The ALJ considered the waxing and waning nature of fibromyalgia in the residual functional capacity assessment. .......................................................................55

       2.    The ALJ's Step Three findings as to Maldonado's mental impairments are supported by substantial evidence..................57
            a.    The ALJ properly assigned little weight to Simmons' opinion............................................................................58
            b.    The ALJ's finding that Maldonado's mental impairments do not medically equal Listings 12.04 or 12.06 is supported by substantial evidence....................................61

       3.    The ALJ properly posed hypotheticals to the vocational expert. ...........................................................................................65

a.    The ALJ accounted for Maldonado's difficulties in concentration, persistence, and pace. ...............................66

b.    The ALJ considered Maldonado's documented symptoms of mental impairments. ....................................................67

c.    The ALJ's hypotheticals accounted for Maldonado's hand limitations.........................................................................68

d.    The hypotheticals matched the ALJ's residual functional capacity assessment, which is supported by substantial evidence.............................................................................70

4.    Maldonado has not met her burden in alleging bias and thus remand is not warranted. ...........................................................70

III.    CONCLUSION......................................................................................75

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Maritza Maldonado ("Maldonado") brings this action seeking judicial review of a final determination by Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner"), which denied Maldonado's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act. Maldonado has moved, and the Commissioner has cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Maldonado's motion is denied and the Commissioner's cross-motion is granted.

## I. BACKGROUND

### A. Procedural History

Maldonado applied for DIB and SSI on August 4, 2011. Administrative Record ("R."), Dkt. No. 14 at 21.[2] The Social Security Administration ("SSA") denied Maldonado's application on December 8, 2011. *Id.* at 223–28. On December 20, 2011, Maldonado requested a hearing before an Administrative Law Judge pursuant to 20 C.F.R. § 404.929 and 20 C.F.R. § 416.1429. *Id.* at 229–30. Represented by counsel, Maldonado then appeared at three hearings before Administrative Law Judge Seth I. Grossman (the "ALJ") on November 28, 2012, September 9, 2013, and March 26, 2014. *Id.* at 51–219. In a written decision dated

---

[2] The Review Sheet in the administrative record lists August 4, 2011 as the date Maldonado's applications were filed, R. at 357, and the Disability Report associated with Maldonado's application states that the "Protective Filing Date" was August 4, 2011. *Id.* at 372. However, the DIB and SSI applications are both dated September 14, 2011. *Id.* at 344, 348.

1

September 5, 2014, the ALJ found that Maldonado was not disabled and denied her application for DIB and SSI benefits. *Id.* at 21–43. Maldonado requested review by the SSA Appeals Council on October 9, 2014, but this request was denied on November 27, 2015, rendering the ALJ's decision final. *Id.* at 5–8, 15–16.

Represented by the same counsel who had represented her administratively, Maldonado timely filed this action on January 6, 2016, requesting judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Complaint, Dkt. No. 2 at 1–3. The Commissioner answered and filed the Administrative Record on April 19, 2016. Answer, Dkt. No. 13; R., Dkt. No. 14. On June 21, 2016, Maldonado moved for judgment on the pleadings, seeking reversal of the Commissioner's determination and requesting remand for the calculation of benefits only. Motion for Judgment on the Pleadings, Dkt. No. 20; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 21. On July 12, 2016, the Commissioner cross-moved for judgment on the pleadings. Motion for Judgment on the Pleadings, Dkt. No. 24; Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 25. On July 21, 2016, Maldonado filed a reply in opposition to the Commissioner's cross-motion. Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in Further Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Reply"), Dkt. No. 26.

2

### B.    The Administrative Record

#### 1.  Maldonado's Background

Maldonado was 46 years old on the amended disability onset date of January

1, 2012.  *Id.* at 21, 189, 372.  She was born in Brooklyn and lived there until she was

11 years old, when she moved to Puerto Rico.  *Id.* at 190–91.  She graduated from

high school in Puerto Rico, then moved to the Bronx when she was 22 years old to

attend Bronx Community College, but she did not attain a degree.  *Id.* at 191, 124–

25.  Maldonado lives with her two adult daughters, a toddler son, and a toddler

granddaughter.  *Id.* at 200.  She previously worked as a travel agent, receptionist,

field interviewer, driving instructor, and marketing collector (a job that required

her to sit in an office and call "people who owed money").  *Id.* at 163–65, 377.

Maldonado applied for SSI and DIB based on several alleged medical

conditions: fibromyalgia, asthma, depression, and severe body pain.  *Id.* at 376.  She

further testified during the administrative hearings that she had anxiety,

osteoporosis, arthritis, and Carpal Tunnel Syndrome.  *Id.* at 92, 196–97, 214.

During the hearings before the ALJ, Maldonado described her impairments

and ability to function.  Regarding her fibromyalgia symptoms, Maldonado reported

that she experienced chronic and constant pain in her arms, back, hips, legs, ankles,

and toes.  *Id.* at 60–61, 130, 183.  She claimed that her body was sensitive, and the

pain was often magnified, intensified, and widespread.  *Id.* at 130, 183.  She also

said that she experienced numbness and stiffness in her hands and arms. Id. at 61–

62, 199.  She added that she was constantly tired and fatigued.  *Id.* at 56, 61, 199.

3

Maldonado addressed her physical limitations and testified that she could not walk long distances or climb stairs. *Id.* at 214. She could not sit, stand, walk for more than 10 to 20 minutes, or bend over. *Id.* at 59–61, 134. She could sometimes carry a can of soda, but not a gallon of milk. *Id.* at 62, 94, 134. She could not push or pull objects. *Id.* at 135. She could not pick up a coin, open 10 files, make 20 phone calls, use scissors, or pack boxes of widgets. *See, e.g.*, *id.* at 62–63, 135–36. She "dropped everything" and could not write her name. *Id.* at 61–62, 94, 135, 183.

Maldonado also testified about her daily activities. She explained that she had "good days" and "bad days" concerning the severity of her symptoms. *Id.* at 60. She described a bad day as when "[she] had no sleep . . . could barely get out of bed . . . [and her] back [was] aching." *Id.* A good day was when she "maybe slept an hour, hour and a half . . . [and had] some energy to get up and do . . . what a normal day would be." *Id.* A normal day for Maldonado consisted of taking three to four naps during the day. *Id.* She had trouble climbing into and getting out of bed. *Id.* at 56, 60, 183. She could not do chores; her daughters had to help around the house. *See, e.g.*, *id.* at 61–62, 200. They helped Maldonado bathe, dress, fix her hair, grocery shop, clean, cook, and write letters. *See, e.g.*, *id.* at 95, 142. Maldonado could not care for her toddler son; Nesley Santiago, one of Maldonado's daughters, testified that she and her sister would bathe and dress their younger brother, cook for him, pick him up from daycare, and clean up after him. *See, e.g.*, *id.* at 57, 131, 201. At times, Maldonado could go shopping with her daughters, but she would complain about pain in her feet and tiredness. *Id.* at 61, 144, 146.

4

Regarding her mental impairments, Maldonado testified that she suffered from anxiety, forgetfulness, "mental fog," and concentration issues. *Id.* at 197, 199, 214. She added that her memory was not good. *Id.* at 131. Santiago testified that her mother was able to go to church with relatives. *Id.* at 141, 146. According to Santiago, she got along with her friends, did not fight with others, and had not distanced herself from anyone. *Id.* at 168. However, at times she preferred not to be bothered when people called her. *Id.* At the time of the administrative proceedings, Maldonado was taking several different psychiatric medications to manage her mental-health symptoms. *Id.* at 210. As is described further below, she had also been receiving psychotherapy treatment at Morris Heights Health Center. *Id.* at 212.

## 2.  Medical Evidence in the Record

### a.  Medical History

#### i.  Asthma

Maldonado has had a history of asthma since childhood, having previously used Singulair, Ventolin, and Albuterol. *Id.* at 519, 558, 767. Maldonado reported that she visited the emergency room for asthma about two to three times per year, *id.* at 767, though the administrative record does not contain evidence of these hospital visits. *Id.* at 27.

#### ii.  Bariatric Surgery

Maldonado's primary-care physician, Dr. Marguerite Bernard, first documented Maldonado's obesity on September 10, 2010 and ordered a bariatric

5

surgery to reduce her weight. *Id.* at 527.[3] On October 27, 2011, Dr. Catherine Pelczar-Wissner, an internist, consultatively examined Maldonado and reported that Maldonado was 61 inches tall and 243 pounds. *Id.* at 520. Maldonado then had a bariatric sleeve placed on February 9, 2012. *Id.* at 653. After the operation, at the hearing on November 28, 2012, and at the second hearing on September 9, 2013, Maldonado testified that she weighed 170 pounds and 168 pounds, respectively. *Id.* at 149, 203. On December 19, 2012, Dr. Iqbal Teli, another internist, noted that Maldonado weighed 136 pounds, *id.* at 767, though both Maldonado and the ALJ believed that number could have been a typographical error. *Id.* at 149–50.

### iii. Dr. Marguerite Bernard – Primary Care Physician

Maldonado visited her primary-care physician, Dr. Bernard, six times between September 26, 2011 and April 24, 2013. *Id.* at 523–32, 685–88, 699–702, 707–10, 756–58, 853–55, 859–64. She reported headaches, joint pain, and back pain on several occasions, but Dr. Bernard noted that she walked with a normal gait, was fully oriented, displayed appropriate affect, and her memory was "grossly intact." *Id.* at 686, 700, 756–57. On September 14, 2012, Dr. Bernard referred her to a neurologist for a second opinion on her "throbbing frontal headaches" and noted that although Maldonado seemed anxious, she walked with a normal gait, was fully

---

[3] "Bariatrics" is defined as "a branch of medicine that deals with the treatment of obesity." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/bariatrics (last visited Mar. 9, 2017).

6

oriented, and her memory was intact. *Id.* at 708–09. On December 14, 2012, Maldonado complained of pain from her chest down to her left side and back that lasted for three weeks leading up to the appointment. *Id.* at 853. Dr. Bernard noted that Maldonado's left latissumus dorsi muscle region was tender and had a limited range of motion. *Id.* at 854.[4] Maldonado demonstrated lateral flexion and rotation to the right. *Id.* Dr. Bernard diagnosed her with muscle strain and prescribed medication. *Id.* at 855. Finally, on April 24, 2013, Maldonado continued to complain of pain in her middle to lower back, right arm, and extremities. *Id.* at 859. Dr. Bernard again noted that she walked with a normal gait, was fully oriented, displayed appropriate affect, and her memory was largely intact. *Id.* at 861.

### iv. Catskill Pain Management Clinic

Maldonado's treating rheumatologist, Dr. Arlene Tieng, referred her to a pain-management clinic in June 2012. *Id.* at 635. Treatment notes from the Catskill Pain Management Clinic ("Catskill") show that Maldonado made visits to the clinic 30 times from September 25, 2012 through September 4, 2013. *Id.* at 789–888.

---

[4] "Latissimus dorsi" is defined as "a broad flat superficial muscle of the lower part of the back that originates mostly in a broad aponeurosis attached to the spinous processes of the vertebrae of the lower back, the supraspinal ligament, and the crest of the ilium, that is inserted into the bicipital groove of the humerus, and that extends, adducts, and rotates the arm medially and draws the shoulder downward and backward." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/latissimus%20dorsi (last visited Mar. 9, 2017).

7

Physical exams showed no clubbing, edema, or cyanosis in her extremities. *Id.* at 790. On September 25, 2012, a physician at Catskill recommended an electromyography test for Maldonado's wrist and physical therapy to alleviate pain in her shoulder. *Id.* at 790.[5] Based on the electromyography and other tests, Maldonado was diagnosed with Carpal Tunnel Syndrome. *Id.* at 792. A physician at Catskill also diagnosed Maldonado with rotator cuff tendinitis following positive tests consistent with symptoms of shoulder pain, which worsened with overhead activity. *Id.*[6]

On October 24, 2012, Maldonado's neurological exam was positive for tingling and numbness, and her muscoskeletal exam was positive for joint pains and arthritis. *Id.* at 793. She began physical therapy thereafter and received cortisone injections to her wrist on October 25, 2012. *Id.* at 794–97. Maldonado tolerated the physical therapy "well without adverse effects." *Id.* at 798. She also wore hand braces as part of her treatment. *Id.* at 803. She continued to attend physical

---

[5] "Electromyograph" is defined as "an instrument that converts the electrical activity associated with functioning skeletal muscle into a visual record or into sound and has been used to diagnose neuromuscular disorders and in biofeedback training." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/electromyograph (last visited Mar. 9, 2017).

[6] "Rotator cuff" is defined as "a supporting and strengthening structure of the shoulder joint that is made up of part of its capsule blended with tendons of the subscapularis, infraspinatus, supraspinatus, and teres minor muscles as they pass to the capsule or across it to insert on the humerus." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/rotator%20cuff (last visited Mar. 9, 2017); "Tendinitis" is defined as "inflammation of a tendon." *Id.* at http://c.merriam-webster.com/medlineplus/tendinitis.

8

therapy at Catskill, where the medical associates noted after most visits that

Maldonado felt "better after treatment" and that she was "making steady progress."

*See, e.g., id.* at 799–801, 804–07, 813–16, 830–33.

Maldonado's physical therapy was interrupted after January 28, 2013,

because her medical insurance did not allow for additional treatment. *Id.* at 821.

On February 20, 2013, a physician at Catskill noted that her neck pain was not

improving. *Id.* at 823. On March 6, 2013, a different physician noted that she

walked with an antalgic gait. *Id.* at 825.[7] Notes from this visit indicated that

Maldonado's symptoms of overall body pain dating back to 2009 were "likely related

to fibromyalgia," and that they would restart physical therapy to improve her pain

and function. *Id.*[8] The physician also noted that there was "no clear neurological

deficit." *Id.* On May 13, 2013, Maldonado received a cortisone injection to help with

her shoulder pain. *Id.* at 829. On June 13, 2013, treatment notes referenced a

cervical MRI test administered on May 16, 2013 that showed a moderate focal size

disc bulge to the left side with effacement of the thecal sac and flattening of the

---

[7] "Antalgic" is defined as "marked by or being an unnatural position or movement assumed by someone to minimize or alleviate pain or discomfort (as in the leg or back)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/antalgic (last visited Mar. 9, 2017).

[8] "Fibromyalgia" is defined as "a chronic disorder characterized by widespread pain, tenderness, and stiffness of muscles and associated connective tissue structures that is typically accompanied by fatigue, headache, and sleep disturbances." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/fibromyalgia (last visited Mar. 9, 2017).

9

cord. *Id.* at 835–36.[9]  The treatment notes also indicated that Maldonado's
bilateral shoulder pain and range of motion limitation was likely related to
myofascial pain, and thus a physician at Catskill diagnosed Maldonado with
cervicalgia and myofascial pain. *Id.*[10]

On July 24, 2013, Maldonado received more trigger point injections. *Id.* at
837–38. A Catskill physician documented that she walked with an antalgic gait but
did not need an assistive device, and that her balance and coordination were intact.
*Id.* On August 21, 2013, Maldonado reported that her symptoms were more severe
than her previous visit, and the treatment notes refer to an x-ray showing mild
degenerative changes of bilateral acromioclavicular joints. *Id.* at 839.[11]

---

[9] "Thecal sac" is defined as "the membranous sac of dura mater covering the spinal
cord and cauda equina and containing cerebrospinal fluid." U.S. NATIONAL LIBRARY
OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/thecal sac
(last visited Mar. 9, 2017).

[10] "Cervicalgia" is defined as "pain in neck." CENTER FOR DISEASE CONTROL AND
PREVENTION: INTERNATIONAL CLASSIFICATION OF DISEASES, NINTH REVISION,
CLINICAL MODIFICATION, 6TH EDITION § 723 (Westlaw 2014), *available at* Westlaw 1
ICD-9 CM Table of Diseases and Injuries § 723. "Myofascial" is defined as "of or
relating to the fasciae of muscles." U.S. NATIONAL LIBRARY OF MEDICINE:
MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/myofascial (last visited
Mar. 9, 2017).

[11] "Acromioclavicular" is defined as "relating to, being, or affecting the joint
connecting the acromion and the clavicle." U.S. NATIONAL LIBRARY OF MEDICINE:
MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/acromioclavicular (last
visited Mar. 9, 2017).

### b. Physician's Assessments

#### i. Dr. Arlene Tieng – Treating Rheumatologist

Maldonado visited Dr. Tieng, her treating rheumatologist, five times between June 30, 2011 and September 21, 2012. *Id.* at 548–53, 651–54. Dr. Tieng diagnosed Maldonado with fibromyalgia and osteoarthritis of the spine, and indicated that her fibromyalgia pain affected her daily activities. *Id.* at 516, 548, 550, 552, 651, 653.[12] Dr. Tieng noted that NSAIDS did not alleviate Maldonado's hand pain and numbness, or her foot pain. *Id.* at 548, 550, 552, 651, 653.[13] At all of Maldonado's visits, Dr. Tieng noted 11 to 12 fibromyalgia tender points, but observed that Maldonado walked with a normal gait. *Id.* She also documented a Mental Resonance Imaging ("MRI") test showing "[m]ild degenerative changes of desiccation . . . of multiple lumbar discs . . . [m]inor degenerative bone changes . . . at the anterior inferior margin of L2 vertebral body, [and n]o significant lumbar disc herniations, spinal stenosis, abnormalities of corners of intradural lesions of lumbar

---

[12] "Osteoarthritis" is defined as "a common form of arthritis typically with onset during middle or old age that is characterized by progressive degenerative changes in the cartilage of one or more joints (as of the knees, hips, and hands) accompanied by thickening and overgrowth of adjacent bone and that is marked symptomatically chiefly by stiffness, swelling, pain, deformation of joints, and loss of range of motion)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/osteoarthritis (last visited Mar. 9, 2017).

[13] "NSAIDS" is defined as "a nonsteroidal anti-inflammatory drug (as ibuprofen)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/nsaids (last visited Mar. 9, 2017).

11

dural sac." *Id.*[14] At each visit, Dr. Tieng encouraged diet and exercise for Maldonado's obesity, and prescribed medication for her fibromyalgia and osteoarthritis. *Id.* She referred Maldonado to the Catskill Pain Management Clinic in June 2012. *Id.* at 654.

Dr. Tieng completed a Medical Source Statement on June 8, 2012. *Id.* at 628–34. In the Statement, she reiterated her diagnosis of fibromyalgia and osteoarthritis, and supported her findings by indicating Maldonado's symptoms of diffuse body pain, trigger points, weight change, and tenderness in areas of her body. *Id.* at 628. She stated that depression and anxiety affected Maldonado's pain by increasing the severity of her symptoms and limitations. *Id.* at 629. She indicated that Maldonado frequently experienced severe pain that interfered with her attention and concentration abilities. *Id.* When asked to evaluate the degree to which Maldonado would be limited in her ability to deal with work stress, Dr. Tieng noted that she would be moderately limited. *Id.*

Dr. Tieng assessed Maldonado's exertional limitations and found that Maldonado could continuously sit for less than 15 minutes before alternating postures, though she would only need to stand or walk about for less than 15 minutes before returning to a seated position, and could sit for a total of six hours in an eight-hour work day. *Id.* at 629–30. She found that Maldonado could stand or

---

[14] "Spinal stenosis" is defined as "the narrowing of the lumbar spinal column that produces pressure on the nerve roots resulting in sciatica and a condition resembling intermittent claudication and that usually occurs in middle or old age." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/spinal%20stenosis (last visited Mar. 9, 2017).

12

walk for 30 minutes continuously, for a total of six hours in a work day, and would only need to sit in a working position (as opposed to lying down or reclining) for less than 15 minutes before returning to standing or walking. *Id.* at 630–31. Although Maldonado would need to lie down or recline during a work day, a morning break, lunch period, and afternoon break would be sufficient. *Id.* at 631. She could lift and carry one to five pounds constantly, six to 10 pounds frequently, 11 to 20 pounds occasionally, and never more than 21 pounds. *Id.* at 632. She retained movement in both hands, and was capable of handling, fingering, and reaching frequently. *Id.* at 632–33. She did not need assistive devices to ambulate. *Id.* at 633. Dr. Tieng indicated that Maldonado experienced "good days" and "bad days" such that she would likely be absent from work more than three times a month. *Id.* at 634.

### ii. Dr. Catherine Pelczar-Wissner – Internal Medical Consultative Examiner

On a consultative basis, Dr. Catherine Pelczar-Wissner evaluated Maldonado on October 27, 2011. *Id.* at 519–22. Despite Maldonado's complaints about pain, Dr. Pelczar-Wissner noted that Maldonado was capable of cooking, cleaning, doing laundry, shopping, showering, dressing, and watching TV, albeit with help. *Id.* Based on her examination of Maldonado, Dr. Pelczar-Wissner noted that she did not seem to be in acute distress, and had a normal gait and stance. *Id.* She could walk on her heels and toes without difficulty and do a half squat without assistance. *Id.* Though she moved stiffly and slowly, she did not need help ambulating. *Id.* at 520. Maldonado's musculoskeletal review showed that her cervical lumbar spines had full flexion, extension, lateral flexion, and full rotary movement bilaterally. *Id.* at

13

521. Dr. Pelczar-Wissner did not find evidence of scoliosis, kyphosis, or abnormality in her thoracic spine. *Id.*[15] Maldonado exhibited full range of motion for her shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. *Id.* Dr. Pelczar-Wissner documented that her joints were stable and nontender. *Id.* She did not find evidence of redness, heat, swelling or effusion, nor did she find any trigger points indicative of fibromyalgia. *Id.* Maldonado did not exhibit any sensory deficits and had full grip strength of 5/5 in both upper and lower extremities. *Id.* Dr. Pelczar-Wissner noted no significant varicosities or trophic changes in her extremities. *Id.*[16] Maldonado's hand and finger dexterity were intact as well. *Id.*

Dr. Pelczar-Wissner diagnosed Maldonado with depression, complaints of lower back pain radiating to the right leg, fibromyalgia, and asthma with stable prognoses for all. *Id.* at 521–22. She recommended that Maldonado avoid smoke, dust, and other known respiratory irritants and prescribed mild restrictions for heavy lifting and carrying. *Id.* at 522.

---

[15] "Scoliosis" is defined as "a lateral curvature of the spine." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/scoliosis (last visited Mar. 9, 2017). "Kyphosis" is defined as "the exaggerated outward curvature of the thoracic region of the spinal column resulting in a rounded upper back." *Id.* at http://c.merriam-webster.com/medlineplus/kyphosis.

[16] "Varicosity" is defined as "the quality or state of being abnormally or markedly swollen or dilated." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/varicosities (last visited Mar. 9, 2017). "Trophic" is defined as "of or relating to nutrition." *Id.* at http://c.merriam-webster.com/medlineplus/trophic.

14

### iii. Dr. Iqbal Teli – Internal Medical Consultative Examiner

On a consultative basis, Dr. Iqbal Teli examined Maldonado on December 19, 2012. *Id.* at 767–75. Dr. Teli noted that although Maldonado did not cook or clean, she showers and dresses daily, was not in acute distress, had a normal stance, and walked with a normal gait. *Id.* at 767–68. She could walk on her heels and toes, get on and off the exam table, and rise from her chair without difficulty or assistive devices. *Id.* at 768. She could squat to 40 percent due to leg pain, but declined to bend down during the exam. *Id.* A review of Maldonado's musculoskeletal system showed that her cervical spine had full flexion, lateral flexion, and full rotary movement bilaterally. *Id.* Dr. Teli noted no scoliosis, kyphosis, or abnormality in the thoracic spine. *Id.* There was also no evidence of subluxations, contractures, ankyloses, or thickening of the joints. *Id.* at 768–69.[17] He also noted that Maldonado's lumbosacral spine could extend to 25 degrees. *Id.* at 768. Dr. Teli noted SLR to be negative bilaterally, but Maldonado demonstrated a full range of motion for her shoulders, elbows, forearms, wrists, hips, knees, and

---

[17] "Subluxation" is defined as "partial dislocation (as of one of the bones in a joint)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/subluxation (last visited Mar. 9, 2017). "Contracture" is defined as "a permanent shortening (as of muscle, tendon, or scar tissue) producing deformity or distortion." *Id.* at http://c.merriam-webster.com/medlineplus/contracture. "Ankylosis" is defined as "stiffness or fixation of a joint by disease or surgery." *Id.* at http://c.merriam-webster.com/medlineplus/ankylosis.

15

ankles bilaterally. *Id.*[18] Her joints were stable and nontender, and Dr. Teli noted

no redness, heat, swelling, or effusion. *Id.* at 769.[19] Maldonado's touch sensation

was diminished and pain sensation was absent in her right hand and in both legs.

*Id.* He found no cyanosis, clubbing, edema, trophic changes, muscle atrophy, or

significant varicosities. *Id.*[20] Maldonado's hand and finger dexterity were intact,

with bilateral grip strength of 5/5 for both hands. *Id.*

Dr. Teli diagnosed Maldonado with a history of general non-specific body pain

and asthma, and assigned a stable prognosis for both. *Id.* He suggested that

Maldonado avoid dust and other respiratory irritants, and prescribed mild

restrictions for squatting. *Id.* He also assessed limitations on work-related

activities and found that Maldonado could occasionally lift and carry up to 10

pounds, but no more. *Id.* at 770. During an eight-hour work day, without

interruption or the need for assistive devices, she could sit for two to four hours,

stand for one hour to two hours, and walk for 20 minutes to one hour. *Id.* at 771.

---

[18] "SLR" is defined as "the abbreviation for straight leg raising." STEDMAN'S MEDICAL DICTIONARY (Westlaw 2014), *available at* Westlaw Stedmans 825160.

[19] "Effusion" is defined as "the escape of a fluid from anatomical vessels by rupture or exudation." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/effusion (last visited Mar. 1, 2017).

[20] "Cyanosis" is defined as "a bluish or purplish discoloration (as of skin) due to deficient oxygenation of the blood)." U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, http://c.merriam-webster.com/medlineplus/cyanosis (last visited Mar. 1, 2017). "Clubbed" is defined as "having a bulbous enlargement of the tip with convex overhanging nail." *Id.* at http://c.merriam-webster.com/medlineplus/clubbed. "Edema" is defined as "an abnormal excess accumulation of serous fluid in connective tissue or in a serous cavity." *Id.* at http://c.merriam-webster.com/medlineplus/edema.

16

She could use both hands frequently for manipulative tasks, but only occasionally push and pull. *Id.* at 772. She could use both feet occasionally to operate foot controls. *Id.* She could occasionally perform postural activities, but never crawl. *Id.* at 773. As for her work environment, Maldonado was limited to occasional exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle, and no exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and heat, and vibrations. *Id.* at 774. She could shop and travel without company, walk at a reasonable pace, use public transportation, climb steps using a single hand rail, prepare simple meals, feed herself, care for personal hygiene, and sort or handle papers and files. *Id.* at 775.

### c. Physicians' Assessments – Mental Impairments

#### i. Dr. Richard Frenkel – Treating Psychiatrist

Dr. Richard Frenkel, Maldonado's treating psychiatrist at Morris Heights Health Center ("MHHC"), evaluated her on a monthly basis from July 2011 through December 2011. *Id.* at 533–38, 582–85, 589–91, 595–97, 607–09, 665–67. On August 11, 2011, Dr. Frenkel observed that Maldonado was not depressed or anxious, she was sleeping well and her appetite was good. *Id.* at 536. Dr. Frenkel noted on separate occasions that Maldonado's medication improved her sleep and stopped her anxiety, depression, and mood swings. *Id.* at 607, 665.

At each visit, Dr. Frenkel found that Maldonado's mental status was normal. *See, e.g., id.* at 533, 536, 589, 607. Specifically, he noted her upright posture and that she was well groomed. *Id.* He specifically noted that her mood, affect, and

17

speech were normal; that she was fully oriented to person, place, and time; that her memory, attention, and concentration were all intact; and that she demonstrated good judgment, insight, and impulse control. *Id.* Dr. Frenkel diagnosed Maldonado at every visit with "adjustment disorder with depressed mood." *See, e.g., id.* at 583, 608, 665. Additionally, Dr. Frenkel's global assessment of functioning ("GAF") score for Maldonado remained at 58. *See, e.g., id.* at 584, 596, 666.[21]

### ii. Dr. John Spiegel – Treating Psychiatrist

Dr. John Spiegel treated Maldonado after Dr. Frenkel left MHHC, beginning in March 2012. *Id.* at 671–73, 678–84, 693–95, 703–06, 711–13, 845–52. Dr. Spiegel noted that he did not believe Maldonado was complying with her treatments and taking her medication as prescribed. *Id.* at 693. At each visit, Dr. Spiegel noted Maldonado's upright posture and that she was well groomed. *See, e.g., id.* at 682, 711, 845. He consistently observed that her mood, affect, and speech were normal; that she was fully oriented to person, place, and time; that her memory, attention, and concentration were all intact; and that she demonstrated good

---

[21] The GAF is "a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning," and runs from 0 to 100. *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376–77, at 34 (4th ed., text revision, 2000)). "A score of 41–50 indicates serious symptoms, a score of 51–60 indicates moderate symptoms and a score of 61–70 indicates some mild symptoms or some difficulty in social or occupational functioning . . . ." *Maldonado v. Colvin*, No. 15-CV-4016 (HBP), 2017 WL 775829, at *5 (S.D.N.Y. Feb. 28, 2017) (citing Global Assessment of Functioning, New York State Office of Mental Health, *available at* https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf).

18

judgment, insight, and impulse control. *See, e.g., id.* at 671, 682, 845. However, on

three occasions he did evaluate Maldonado's mood as "anxious," but noted that she

was otherwise normal. *Id.* at 693, 703, 711. Dr. Spiegel diagnosed Maldonado with

"adjustment disorder with depressed mood." *See, e.g., id.* at 683, 694, 712. He first

assessed Maldonado's GAF score at 55 during her first two visits, *id.* at 672, 683,

and raised it to 58 during subsequent visits. *Id.* at 694, 704, 846.

### iii. Shelbi Simmons, LCSW – Treating Psychotherapist

Maldonado visited Shelbi Simmons, a licensed clinical social worker, for

psychotherapy treatment from April 19, 2011 through March 14, 2013. *Id.* at 561–

81, 586–88, 592–94, 598–606, 668–70, 674–77, 696–98, 718–19, 857–58. Simmons

documented Maldonado's reports that she did not feel relief from the pain caused by

her fibromyalgia. *Id.* at 561, 564. On one occasion, Simmons recorded that

Maldonado brought her "rambunctious" son to her appointment, which caused

Maldonado to be "physically active," including "walking around and lifting her son"

during the session. *Id.* at 570–71.

Simmons noted that Maldonado demonstrated moderate levels of motivation

and functioning. *See, e.g., id.* at 564, 576, 598. At times, her thought process was

impaired or "racing" with inappropriate thought content and persistent worries.

*See, e.g., id.* at 561, 573, 592. However, Simmons documented no evidence of

psychosis. *See, e.g., id.* at 561, 567, 601. Maldonado attended her appointments

casually groomed, and sat quietly with an erect or relaxed posture. *See, e.g., id.* at

568, 605. A few times, she displayed restless or agitated behavior. *See, e.g., id.* at

19

562, 599, 602. Sometimes she was anxious, irritable, or depressed. *See, e.g., id.* at 587, 602, 605. Maldonado always demonstrated normal affect and speech, and was fully oriented at every visit. *See, e.g., id.* at 562, 565, 580, 599. Her memory, attention, and concentration were usually intact. *See, e.g., id.* at 562, 580, 599. She demonstrated limited or minimally impaired memory, attention, and concentration at only three visits. *Id.* at 565, 577, 605. Additionally, she demonstrated fair or good judgment, insight, and impulse control throughout her treatment. *See, e.g., id.* at 562, 577, 599. Simmons' diagnosis of Maldonado at each visit was "adjustment disorder with depressed mood." *See, e.g., id.* at 562, 577, 600. She also consistently assigned Maldonado a GAF score of 58. *See, e.g., id.* at 562, 578, 600.

On October 27, 2012, Simmons completed a Medical Source Statement, co-signed by Dr. Spiegel. *Id.* at 637–49. She indicated that Maldonado's mental impairments caused marked limitations in her ability to understand, remember, and carry out instructions, and to make judgments on work-related issues. *Id.* at 637. Simmons wrote that her assessment was based on Maldonado's reports that she "easily forget[s] to follow through on simple tasks," and "frequently miss[ed] appointments." *Id.* Simmons further indicated that Maldonado's mental impairments caused marked limitations in her ability to interact appropriately with supervisors, co-workers, and the public, as well as her ability to respond to changes in a routine work setting. *Id.* at 638. This assessment was also based on Maldonado's reports of her own "tendency to socially isolate." *Id.*

Regarding Maldonado's diagnosis, Simmons noted the following symptoms:

20

anhedonia (defined as a "pervasive los[s] of interest in almost all activities"),
decreased energy, generalized persistent anxiety, mood disturbance, difficulty
thinking or concentrating, emotional withdrawal or isolation, hallucinations or
delusions, easy distractibility, and memory impairment. *Id.* at 642. She evaluated
Maldonado's ability to perform unskilled work and found that she could not
remember work-like procedures or "maintain attention for [a] two hour segment."
*Id.* at 643. She also found that Maldonado had serious limitations in performing
other tasks, but was not precluded from working in unskilled positions in all
circumstances. *Id.* at 643–45.[22] Maldonado showed marked limitations in daily
living, social functioning, and maintaining concentration. *Id.* at 648. She noted
that Maldonado would not require more than four absences per month due to her
impairments. *Id.* When prompted to support her findings, Simmons cited
Maldonado's own complaints about memory problems and physical limitations, and
Maldonado's reports of her depressive symptoms. *Id.* at 645–47.

### iv. Dr. David Mahony – Psychiatric Consultative Examiner

On a consultative basis, Dr. David Mahony examined Maldonado on
December 19, 2012. *Id.* at 781–88. He noted that Maldonado had been undergoing
outpatient psychiatric treatment for the past three years. *Id.* at 781. He also noted

---

[22] For example, Simmons found that Maldonado is seriously limited but not
precluded from, among other things, understanding, remembering, and carrying out
very short and simple instructions, maintaining regular attendance and being
punctual, and sustaining an ordinary routine without special supervision. R. at
643–45.

21

that Maldonado displayed symptoms of anxiety and depression, thought-disorders, and cognitive deficits. *Id.* 781–82. Dr. Mahony recorded that when asked about her mental condition, Maldonado stated: "I don't know, my doctor told me I have anxiety." *Id.* at 782. During the appointment, she demonstrated short-term and long-term memory deficits due to symptoms of depression. *Id.* at 783.

For her mental-status exam, Dr. Mahony found that she was casually groomed and walked with a normal gait. *Id.* at 782. Her posture and motor behavior were all normal, and her eye contact was appropriate. *Id.* Her speech was fluent, clear, and expressive. *Id.* Her thought process was coherent without evidence of hallucinations. *Id.* Maldonado displayed depressed affect, dysthymic mood, clear sensorium, and full orientation. *Id.* Her attention and concentration were impaired due to cognitive limitations. *Id.* at 783. She was able to count but could not subtract or do serial threes. *Id.* Her cognitive functioning was below average but she displayed good insight and judgment. *Id.*

In evaluating how Maldonado's impairments affected her daily activities, Dr. Mahony noted Maldonado's reports of needing assistance dressing, bathing, and grooming herself. *Id.* He documented that she could follow, understand, and carry out simple directions, tasks, and instructions. *Id.* Dr. Mahony assigned mild limitations to Maldonado's ability to make judgments on simple work-related decisions. *Id.* at 785. He stated that Maldonado had moderate limitations in her ability to understand, remember, carry out, and make judgments on complex

22

instructions and work-related decisions. *Id.* Maldonado was also moderately limited in her ability to interact with others in a work setting. *Id.* at 786.

Dr. Mahony noted that his evaluation results appeared to be consistent with psychiatric and cognitive problems. *Id.* at 783. He opined that these problems did "not seem to interfere with [her] ability to function on a daily basis." *Id.* He diagnosed Maldonado with major depressive order (moderate), anxiety disorder, and cognitive disorder. *Id.* at 783–84.

### v. Dr. Alexander Alerte – Psychiatric Consultative Examiner

Dr. Alexander Alerte examined Maldonado on a consultative basis on January 16, January 31, February 25, and March 24, 2014. *Id.* at 892. He completed a Mental Residual Functional Capacity Statement on March 31, 2014. *Id.* at 892–95. According to Dr. Alerte's assessment, Maldonado's mental impairments precluded her from performing the following functions "independently, appropriately, [and] effectively" for five percent of an eight-hour workday: mental abilities involving understanding and memory, mental abilities involving sustained concentration and memory, social interaction, and adaptation skills. *Id.* at 892–94. Dr. Alerte also evaluated that she would be "off-task" for 10 percent or less of the day. *Id.* at 894. He estimated that Maldonado would likely be absent or unable to complete a full work day for two days or less per month. *Id.* In comparing Maldonado to an average worker, Dr. Alerte assessed that she could be expected to perform at an 80 percent efficiency rate. *Id.* at 895. Finally, Dr. Alerte assigned Maldonado a GAF score of 60. *Id.*

23

### vi. Dr. M. Apacible – Psychiatric Consultative Examiner

Dr. M. Apacible completed a Psychiatric Review Technique for Maldonado on December 7, 2011. *Id.* at 610–23. He assessed that Maldonado's mental impairment does not meet the diagnostic requirements of an affective disorder. *Id.* at 613. He indicated that Maldonado has mild restrictions on activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. *Id.* at 620. He also noted that Maldonado did not display repeated episodes of deterioration. *Id.* Further, he indicated that Maldonado's affective mood disorder did not establish the presence of a medically documented history of a chronic disorder lasting at least two years that has caused her more than minimal limitation in her ability to do any basic work activity. *Id.* at 621.

Dr. Apacible also completed a Mental Residual Functional Capacity Assessment for Maldonado on December 7, 2011. *Id.* at 624–27. In his report, he indicated that Maldonado is "not significantly limited" in terms of her understanding and memory, or sustained concentration and persistence, and only moderately limited in some of her abilities related to social interaction and adaptation. *Id.* at 624–25. He evaluated that Maldonado "retains the capability to do simple work on a sustained basis, but would find it easier to work in a low contact situation." *Id.* at 626. In addition, he found Maldonado's mental status evaluation to be normal. *Id.*

24

### C.    Hearings Before the ALJ

The ALJ presided over three administrative hearings that took place on November 28, 2012, September 9, 2013, and March 26, 2014. *Id.* at 51–219. Maldonado was represented by counsel at all three proceedings. *Id.* At the first hearing, Maldonado was the only one to testify. *Id.* at 185–219. She described her background, work history, fibromyalgia symptoms, mental condition, and medical treatment. *Id.* At the second hearing, Maldonado testified again, primarily about her work history and physical limitations, *id.* at 124–38, and one of her daughters, Nesley Santiago, testified about her mother's difficulties at home due to her various ailments. *Id.* at 139–47. Additionally, a vocational expert, Raymond Cestar, and a medical expert, Dr. Bernard Gussoff, testified at the second hearing. *Id.* 148–81.[23] At the final hearing, Maldonado and Dr. Gussoff testified again, along with a different vocational expert, Michael Smith. *Id.* at 50–120.

### 1.  Medical Expert Testimony – Dr. Bernard Gussoff

Dr. Bernard Gussoff testified that Maldonado does not have arthritis due to a lack of evidence that Maldonado's joints were inflamed. *Id.* at 161. He opined that Maldonado has obesity, asthma, Carpal Tunnel Syndrome, and fibromyalgia. *Id.* at 149, 156. According to Dr. Gussoff, Maldonado's asthma was "not excessive or troublesome," and thus did not meet or medically equal the Listing requirements for

---

[23] Although Raymond Cestar testified as a vocational expert, the ALJ did not consider his testimony in his decision.

asthma. *Id.* at 156. Her condition was not severe enough to require intubation or a doctor's attention every two to three months. *Id.* at 72, 156.

Dr. Gussoff also testified that the record was consistent with a diagnosis of Carpal Tunnel Syndrome and that such an impairment is usually addressed with localized surgery. *Id.* at 91. Though Dr. Gussoff found this impairment to be legitimate, he doubted that the severity of Maldonado's Carpal Tunnel Syndrome was consistent with her testimony that she could not pick up a coin. *Id.* at 96, 99–100. He explained that someone must have a "very, very severe malfunction of their hand to [have the] inability to pick up a coin." *Id.* at 96. Reviewing the results of Maldonado's consultative examination with Dr. Teli, he stated that he "would be skeptical about a patient who said they couldn't pick up a coin with those findings." *Id.* at 100.

As for her fibromyalgia diagnosis, Dr. Gussoff testified that although the record was rife with reports of body pain, there were no findings indicative of fibromyalgia beyond Maldonado's allegations. *Id.* at 156–57.[24] According to Dr. Gussoff, the record contained no evidence of laboratory studies, blood counts, or radiologic findings that would define an arthritic condition. *Id.* Further, his review

---

[24] During the third hearing, Maldonado's counsel objected to Dr. Gussoff's testimony. Specifically, her counsel argued that his opinion deserved lesser weight than Maldonado's treating physicians because Dr. Gussoff was an internist, not a rheumatologist with expertise relevant to fibromyalgia. R. at 68–69. In his written decision, the ALJ duly considered Maldonado's objections to the expert testimony, finding them to be without merit because Dr. Gussoff testified that his opinions were based on the professional literature regarding fibromyalgia and on experience in his field. *Id.* at 22.

of the medical record uncovered no evidence of physical abnormalities, joint deformities, abnormal x-rays, or elements of rheumatological disorders. *Id.* at 73. Dr. Gussoff explained that trigger points are subjective evidence because they are based on the patient's perception of pain. *Id.* He conceded that a patient's pain can be exacerbated by emotional issues. *Id.* at 80. However, he maintained that Maldonado's impairments do not meet or medically equal Listing requirements for any rheumatological condition. *Id.* at 73. Dr. Gussoff opined that Maldonado can do at least the full range of sedentary work. *Id.* at 74.

### 2. Vocational Expert Testimony – Mr. Michael Smith

During the third hearing, Michael Smith testified as the vocational expert. *Id.* at 100–18. The ALJ posed a hypothetical to Smith involving a person who was capable of doing a full range of sedentary work; frequent but not continuous reaching, handling, fingering, and feeling; and occasional pushing and pulling—but who could only follow simple instructions and perform simple tasks, and who could not be exposed to concentrated pollutants or chemicals. *Id.* at 104–05. Smith opined that the hypothetical person would not be able to perform the work of a collections agent or driving instructor (Maldonado's prior jobs) with these limitations. *Id.* at 105. Smith stated, however, that the person would be able to perform the work of a lens inserter, type copy examiner, and document preparer. *Id.* 105–06. Each of these positions were sedentary, unskilled jobs that would require frequent, but not continuous, manipulative activities. *Id.* 105–07, 109. But if the hypothetical worker would be off-task more than 10 percent of the time or

27

absent more than one day a month, no jobs would be available for that person. *Id.* at 106–07.

The ALJ amended the hypothetical and inquired about sedentary positions that would not require frequent fingering and handling. *Id.* at 111. He asked whether a surveillance-systems monitor would fit the description and Smith agreed. *Id.* at 111–12. Smith testified that a call-out operator would also fit the same criteria. *Id.* at 113. The ALJ asked if an order clerk was another possibility, but Smith testified that an order clerk's position would require frequent handling. *Id.*

## II.   DISCUSSION

### A.   Standard of Review

#### 1.  Judicial Review of the Commissioner's Determination

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by substantial evidence. *Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian,* 708 F.3d at 417 (quoting *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  Remand is "particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, 'further findings would . . . plainly help to assure the proper disposition of [a] claim.'"  *Kirkland v. Astrue,* No. 06-CV-4861 (ARR), 2008 WL 267429, at \*8 (E.D.N.Y. Jan. 29, 2008) (quoting *Butts,* 388 F.3d at 386).

The substantial evidence standard is a "very deferential standard of review," *Brault v. Soc. Sec. Admin.,* 683 F.3d 443, 448 (2d Cir. 2012), and the reviewing court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue,* 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).  In other words, "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"

29

*Brault,* 683 F.3d at 448 (emphasis omitted) (quoting *Warren v. Shalala,* 29 F.3d 1287, 1290 (8th Cir. 1994)).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the individual] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur,* 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.,* 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur,* 722 F.2d at 1037 (citations omitted).

### a. Five-Step Inquiry

The Commissioner's determination of disability follows a sequential, five-step inquiry. *Cichocki v. Astrue,* 729 F.3d 172, 173 n.1 (2d Cir. 2013) (quoting *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir. 1996)). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not employed, at the second step the Commissioner determines whether the claimant has a "severe impairment" restricting his ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has a severe impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix 1 of Subpart P of the regulations (a "Listing"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the Commissioner will find the claimant disabled. *Id.;* 20 C.F.R. § 404.1520(d). If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the residual functional capacity to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant bears the burden at steps one through four of the sequential analysis. *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where

he must establish that the claimant has the ability to perform some work in the national economy. *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel,* 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims,* 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir. 1996) (citing 20 C.F.R. § 404.1512(d)-(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue,* No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has met his duty to develop the record is a threshold question. Before reviewing whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

32

regulations' and also fully and completely developed the administrative record."

*Scott v. Astrue,* No. 09-CV-3999 (KAM)(RLM), 2010 WL 2736879, at *12 (E.D.N.Y.

July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751,

755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart,* No. 02-CV-5782 (FB), 2003 WL

22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully

develop the record is a bedrock principle of Social Security law.") (citing *Brown v.

Apfel,* 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the

claimant has legal counsel. *Perez,* 77 F.3d at 47. Remand is appropriate where this

duty is not discharged. *See, e.g., Moran,* 569 F.3d at 114–15 ("We vacate not

because the ALJ's decision was not supported by substantial evidence but because

the ALJ should have developed a more comprehensive record before making his

decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in

determining whether a claimant is disabled under the [Social Security] Act." *Pena

ex rel. E.R. v. Astrue,* No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. § 404.1527(c), 416.927(d)) (internal quotation marks

omitted). A treating physician's opinion is given controlling weight, provided that

the opinion as to the nature and severity of an impairment "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(c)(2). The regulations define a treating physician as the claimant's "own

33

physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502. Deference to such a medical provider is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue,* No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight."  *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell,* 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

34

Importantly, however, "[t]o the extent that [the] record is unclear, the

Commissioner has an affirmative duty to 'fill any clear gaps in the administrative

record' before rejecting a treating physician's diagnosis." *Selian,* 708 F.3d at 420

(quoting *Burgess,* 537 F.3d at 129); *see Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.

1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate). As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record. Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination." *Lacava v. Astrue,* No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at \*13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by,* 2012 WL 6621722

(S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature
> and extent of the treatment relationship; (ii) the evidence
> in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

*Halloran,* 362 F.3d at 32 (citation omitted); *see* 20 C.F.R. § 404.1527(c)(2). If, based

on these considerations, the ALJ declines to give controlling weight to the treating

physician's opinion, the ALJ must nonetheless "comprehensively set forth reasons

for the weight" ultimately assigned to the treating source. *Halloran,* 362 F.3d at 33; *accord Snell,* 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referencing *Schaal,* 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)). The regulations require that the Commissioner "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician's opinion. *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.,* 2013 WL 1210932, at *15 (quoting *Halloran,* 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

The courts leave it to the finder of fact to resolve any conflicts there may be in the medical testimony, but the ALJ need not "reconcile explicitly every conflicting shred of medical testimony." *Galiotti v. Astrue,* 266 F. App'x 66, 67 (2d Cir. 2008) (quoting *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir. 1983)). A court may not substitute its own judgment so long as the decision of the ALJ, and ultimately that of the Commissioner, "rests on adequate findings supported by evidence having rational probative force." *Id.* (quoting *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002)).

### d. Claimant's Credibility

As to the credibility of a claimant, here, too, the reviewing court must defer to an ALJ's findings. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "In assessing a plaintiff's subjective claims of pain and other symptoms, the ALJ must first determine that there are 'medical signs and laboratory findings which show that [the claimant has] a medical impairment which could reasonably be expected to produce the pain.'" *Vargas v. Astrue*, No. 10-CV-6306 (PKC), 2011 WL 2946371, at *11 (S.D.N.Y. July 20, 2011) (quoting *Snell*, 177 F.3d at 135 and 20 C.F.R. § 404.1529(a)). So long as the "findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte v. Sec'y of Health and Human Servs. of the U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)). However, these findings must "be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)).

Because subjective statements about symptoms alone may not establish a disability, the ALJ follows a two-step analysis for evaluating assertions of pain and other limitations. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). First, the ALJ must weigh whether "the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). If so, the ALJ

37

proceeds to the second step and considers "the extent to which [the claimant's]

symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence of record." *Id.* (citing 20 C.F.R. § 404.1529(a)) (internal

quotation marks omitted). Because "an individual's symptoms can sometimes

suggest a greater level of severity of impairment than can be shown by the objective

medical evidence alone," the ALJ may take into account a variety of other

considerations as evidence. *Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996

WL 374186, at *3 (SSA July 2, 1996)). These include: a claimant's daily activities;

the location, duration, frequency, and intensity of the claimant's pain or other

symptoms; factors that aggravate the symptoms; treatment and medication

necessitated by the pain, or other symptoms and their effects; other alleviating

measures taken by the claimant; and other factors related to the claimant's

functional limitations and restrictions stemming from pain or other symptoms. *Id.*

### B.    The ALJ's Decision

In a 23-page written decision dated September 5, 2014, the ALJ concluded

that Maldonado was not disabled during the period in question. R. at 43.[25] The

ALJ began by addressing various objections that Maldonado's counsel had raised

during the third hearing and in post-hearing submissions prior to the issuance of

his decision. *See id.* at 305–15, 448, 453–54, 457–58. Regarding Maldonado's

allegation that he was biased and abused his discretion during the hearings, the

---

[25] The period at issue began on January 1, 2012, the amended disability onset date, and ended on the date of the ALJ's written decision. R. at 43.

ALJ rejected this charge and stated at the outset of his decision that his intentions

throughout the proceedings were to "issue a decision that was supported by the

evidence, getting the case 'right the first time.'" *Id.* at 22. The ALJ also considered

Maldonado's objections to Dr. Gussoff's and Mr. Smith's testimony, finding them to

be without merit because "both clearly stated for the record that they based their

opinions on the professional literature of their respective fields but also on their

experience." *Id.*

At the first step of the requisite five-step inquiry, the ALJ found that

Maldonado had not engaged in substantial gainful activity since January 1, 2012,

the amended onset date. *Id.* at 24.

At the second step, the ALJ found that Maldonado suffered from several

severe impairments: fibromyalgia, cervical and lumbar disc disease, Carpal Tunnel

Syndrome, rotator cuff tendinitis or frozen shoulder, tendinitis of the bicep tendon,

obesity status post bariatric surgery with significant weight loss, asthma,

adjustment disorder, and anxiety disorder. *Id.* He reached this determination

because Maldonado's impairments imposed "more than minimal limitations" on her

capacity to work. *Id.* The ALJ also considered Maldonado's fibromyalgia diagnosis

under the SSA's Social Security Ruling 12-2p ("SSR 12-2p"). *Id.* at 25; *see* SSR 12-

2p, 2012 WL 3104869 (SSA Jul. 25, 2012).[26]  He reviewed the two tests detailed in

---

[26] The ALJ included this inquiry in his Step Three analysis, but his conclusion that
Maldonado has a medically determinable impairment of fibromyalgia should have
been part of the Step Two analysis. SSR 12-2p does not lay out the criteria to
determine whether the claimant's disability of fibromyalgia medically equals a

SSR 12-2p, either of which can establish fibromyalgia as a medically determinable impairment, but found the record "devoid of evidence consistent with the required criteria" for both tests. *Id.* Specifically, he observed that Maldonado's treating physicians failed to exclude other possible sources of Maldonado's pain, a necessary criterion for the first test. *Id.* He noted evidence of two other possible sources of Maldonado's pain besides fibromyalgia: (1) a mild disc disease of Maldonado's spine, shown by the 2010 MRI test, and (2) a moderate median entrapment at the wrists, consistent with Carpal Tunnel Syndrome, shown by the treatment notes from Catskill. *Id.* He also reasoned that the evidence demonstrated that Maldonado's adjustment and anxiety disorders were isolated conditions separate from her fibromyalgia and for which she was treated by other mental-health providers. *Id.* Despite his findings, however, the ALJ nonetheless "[gave Maldonado] the benefit of the doubt on this issue" and concluded at the second step that Maldonado's fibromyalgia was a severe medically determinable impairment. *Id.* at 26.

At the third step, the ALJ found that Maldonado did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Appendix of Subpart P of the regulations. *Id.* at 25. In reaching this conclusion, he considered medical source opinions as well as the evidence documenting Maldonado's fibromyalgia and mental-health symptoms. *Id.* 25–29. Specifically, the ALJ considered possible relative Listings in combination

---

Listing. Rather, it lists the criteria for determining whether the claimant has a medically determinable impairment of fibromyalgia.

with Maldonado's fibromyalgia.[27] He considered back disorder under Listing 1.04, major dysfunction of a joint under Listing 1.02, obesity under SSR 02-1p, and asthma under Listing 3.03. *Id.* at 26–27. For each one, the ALJ cited mild to moderate findings, which did not meet the Listings' severity requirements. *Id.* He also relied on the testimony of Dr. Gussoff, who opined that none of Maldonado's physical impairments, either alone or in combination, met or medically equaled any of the Listings. *Id.*

After evaluating Maldonado's physical impairments, the ALJ next considered Maldonado's mental impairments and concluded that her adjustment and anxiety disorders did not meet or medically equal the criteria of Listings 12.04 or 12.06. *Id.* at 27. Where an alleged impairment is based on an affective disorder or an anxiety-related disorder, the impairment is considered to be "listed" as a qualifying impairment at Step Three if it satisfies one of two alternative sets of criteria. 20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶¶ 12.04, 12.06.[28] The first, the "paragraph B" criteria, is the same for both Listings 12.04 and 12.06, and requires that the impairment result in at least two of the following: a marked restriction of daily activities; marked difficulties in maintaining social functioning; marked difficulties

---

[27] Fibromyalgia is not a listed impairment and thus cannot, alone, meet a Listing at the third step.

[28] This opinion considers the regulations that were in effect at the time the ALJ issued his decision on September 5, 2014, though the regulations have since been revised. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138-01, 66178 n. 1 (Sep. 26, 2016) ("Federal courts will review [SSA] final decisions using the rules that were in effect at the time [SSA] issued the decisions.").

41

in maintaining concentration, persistence, or pace; or repeated episodes of decompensation or diminished functioning, lasting an extended period. *Id.* ¶¶ 12.04(B), 12.06(B). The ALJ found that Maldonado had moderate difficulties in activities of daily living, no difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and no episodes of decompensation. R. at 27–28. He supported these findings with the outpatient treatment that Maldonado had received for her mental-health conditions; Maldonado's conflicting statements in her testimony; the reports and treatment notes by Dr. Pelczar-Wissner, Dr. Tieng, and Dr. Frenkel; and a consistent GAF score of 58 during the course of her treatment. *Id.*

The ALJ next considered Maldonado's depression using the "paragraph C" criteria under Listing 12.04, which requires that the claimant show:

> [A] [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶ 12.04 (C). The ALJ found that Maldonado's major depression did not satisfy the "paragraph C" criteria of Listing 12.04 because

42

the claimant had been stable with outpatient treatment and could function independently.  R. at 28–29.

The ALJ then considered Maldonado's anxiety, applying the "paragraph C" criteria under Listing 12.06, which requires that the claimant show a "complete inability to function independently outside the area of one's home." 20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶ 12.06 (C).  The ALJ found that Maldonado's anxiety did not satisfy the "paragraph C" criteria of Listing 12.06.  R. at 28–29.  He supported this conclusion by noting that she was stable with outpatient treatment, attended her appointments by herself, and provided care for her toddler son. *Id.*

After finding that none of Maldonado's impairments met or equaled the severity of the listed impairments, the ALJ assessed Maldonado's residual functional capacity for the purpose of Steps Four and Five analyses. *Id.* at 29–41. First, the ALJ concluded that:

> Maldonado has the residual functional capacity to
> perform sedentary work as defined in 20 CFR 404.1567(a)
> and 416.967(a) but limited to work related tasks that
> involve simple instructions.  In addition, the claimant
> cannot be exposed to concentrated pollutants or
> chemicals.  The claimant is also limited to frequent but
> not continuous reaching, handling, fingering, and feeling.
> For the above jobs, the claimant can maintain attention
> and concentration, understand and carry out tasks, and
> keep a regular schedule, all within normal work
> expectations.

*Id.* at 29.  To support this finding, the ALJ followed the two-step process required for evaluating Maldonado's pain symptoms.  At the first step, the ALJ found that Maldonado's medically determinable impairments could reasonably be expected to

43

cause the alleged pain and physical limitations. *Id.* at 30. However, at the second step, the ALJ found that Maldonado was "not entirely credible" when she testified about the intensity, persistence, and limiting effects of her pain and physical limitations. *Id.* The ALJ reached this conclusion by comparing the medical evidence in the record to Maldonado's testimony. *Id.* at 30–42.

To this end, the ALJ first considered the medical opinion of physicians who had examined Maldonado's allegations of pain and fibromyalgia. The ALJ assigned "great weight" to Dr. Pelczar-Wissner's opinion and stable prognosis for Maldonado's depression, low back pain, fibromyalgia, and asthma because it was well supported by a thorough and impartial medical examination. *Id.* at 31. He clarified, however, that Dr. Pelczar-Wissner's opinion carried great weight only "to the extent that the claimant's physical impairments have remained stable even prior to her amended onset date of disability." *Id.*

The ALJ then assigned "partial weight" to Dr. Tieng's opinion. *Id.* at 32. He clarified that he afforded "great weight" to Dr. Tieng's opinion that Maldonado could sit, stand, and walk each for up to six hours during an eight-hour work day without an assistive device; lift and carry up to five pounds constantly, up to 10 pounds frequently, and up to 20 pounds occasionally; and use her hands for manipulative activities frequently. *Id.* According to the ALJ's review of the record, Dr. Tieng's report was "well supported by clinical findings," "consistent with the residual functional capacity assessment," "explained in detail, considering the claimant's allegations of pain and the identified [f]ibromyalgia tender points," and was thus

"reasonable." *Id.* However, he excluded the "vague statement" about Maldonado's
need to be absent from work more than three times a month because it was
"unsupported and inconsistent with Dr. Tieng's own clinical findings." *Id.* He also
noted that this specific finding by Dr. Tieng contradicted Maldonado's admissions
that her failure to attend some medical appointments was due to lack of childcare,
not due to pain. *Id.*

The ALJ next assigned "partial weight" to the medical source statement of
Dr. Teli. *Id.* at 34. Specifically, the ALJ noted that Dr. Teli's opinion on
Maldonado's limitations for lifting and carrying was "well supported by the record
and consistent with the opinion of Dr. Tieng." *Id.* However, the ALJ excluded Dr.
Teli's opinion on Maldonado's limitations for standing, sitting, pushing and pulling
because they were inconsistent with Dr. Tieng's opinion. *Id.* Moreover, the ALJ
noted that they seemed to be based on Maldonado's subjective reports of her
symptoms rather than on Dr. Teli's own clinical findings. *Id.*

The ALJ attributed "great weight" to Dr. Gussoff's testimony because he
based his opinion on specific references to the record and the lack of evidence
showing Maldonado could not perform sedentary work. *Id.* at 39. Further, the ALJ
noted that Dr. Gussoff's testimony was "cogent, convincing[,] and in accord with the
weight of the record evidence." *Id.*

The ALJ also considered the treatment notes of the Catskill medical
associates, which documented that "physical examinations [of Maldonado]

45

consistently showed subjective complaints of pain . . . but no objective findings." *Id.* at 33.

Continuing his review of the medical evidence in the record, the ALJ then considered the medical opinions of mental-health professionals regarding Maldonado's mental impairments. The ALJ afforded "little weight" to the opinion of Simmons for a number of reasons: (1) she was not an acceptable medical source as a licensed clinical social worker; (2) her opinion was inconsistent with that of co-signer Dr. Spiegel, who consistently assessed Maldonado's mental state as normal (specifically that her memory, attention, and concentration were all intact), and consistently gave Maldonado a GAF score of 55 or 58; (3) her opinion seemed to be based solely on Maldonado's subjective complaints rather than on objective findings, clearly stating that she formulated her opinion by considering factors that were based on Maldonado's reports; (4) her statement indicating that Maldonado missed medical appointments due to poor memory was inconsistent with the evidence in the record, which shows that Maldonado missed medical appointments due to other appointments and lack of childcare; and (5) her report was inconsistent with her treatment notes in which she consistently gave Maldonado a GAF score of 58, a score that is consistent with the score given by Maldonado's treating psychiatrist. *Id.* at 36–37.

The ALJ also observed that the opinion of Dr. Alerte was generally consistent with the findings of Dr. Spiegel and Dr. Frenkel, and thus further supported the finding that Maldonado could perform adequately at a job that only required her to

46

perform simple tasks and follow simple instructions. *Id.* at 37. The ALJ assigned

Dr. Mahony's opinion "significant weight" because it was "well supported" by

objective findings and was consistent with the findings of Dr. Spiegel and Dr.

Frenkel. *Id.* at 38. The ALJ also stated that Dr. Apacible's findings that

Maldonado did not meet "Paragraph B" criteria supported the ALJ's conclusions

about her mental residual functional capacity. *Id.* at 39.

After reviewing the medical evidence, the ALJ then considered Maldonado's

testimony, comparing it to the various physicians' assessments and opinions, in

order to assess her credibility. *Id.* The ALJ pointed out multiple inconsistencies in

the record where medical evidence contradicted Maldonado's statements about the

severity of her symptoms. *Id.* at 31–34, 37, 39–41. For example, the ALJ noted that

Maldonado's allegations of memory difficulties were inconsistent with treatment

notes that documented her memory, concentration, and attention to be intact. *See,*

*e.g.,* 562, 583, 699, 757. The ALJ pointed out that although Maldonado asserted

that she had trouble ambulating, multiple physicians concluded that she did not

need an assistive device. *See, e.g.,* 520, 633, 768. The ALJ explained that despite

Maldonado's allegations of her inability to lift or carry objects, Dr. Tieng opined that

she could constantly carry up to five pounds and frequently carry up to 10 pounds.

*Id.* at 632. For these reasons, the ALJ concluded that Maldonado had a residual

functional capacity to perform sedentary work, with frequent but not continuous

manipulative activities, and environmental limitations consistent with Maldonado's

history of asthma. *Id.*

At the fourth step, the ALJ concluded that Maldonado was unable to perform past relevant work based on her residual functional capacity. *Id.* The ALJ supported this finding with the vocational expert's testimony that Maldonado's past relevant work involved semiskilled mental demands. Because Maldonado's residual functional capacity only allowed for unskilled work, the ALJ determined that Maldonado could no longer perform past relevant work. *Id.*

At the fifth step, the ALJ concluded that there are a significant number of jobs available that a hypothetical person with Maldonado's age, education, work experience, and residual functional capacity could perform. *Id.* at 42. The ALJ considered the vocational expert's testimony that a hypothetical person in Maldonado's situation could work as a lens inserter, type copy examiner, or documents preparer. *Id.* Moreover, the ALJ reasoned that even if Maldonado's residual functional capacity limited her to jobs with only occasional fingering, a significant number of positions that she could perform remained, such as a surveillance systems monitor or a call out operator. *Id.* Thus, the ALJ found that Maldonado could perform all of these jobs based on the assessed residual functional capacity, and concluded that Maldonado was not disabled. *Id.*

## C. Analysis

As a preliminary matter, the ALJ properly developed the record, which Maldonado does not contest.[29] Nonetheless, Maldonado argues that the ALJ erred

---

[29] In reviewing the record's consistency and sufficiency, the ALJ will determine the best course of action to ensure that the record is fully developed, which may include (1) recontacting the treating physician, (2) requesting additional existing records,

multiple times in determining that she was not disabled, thus wrongly denying her applications for DIB and SSI. First, Maldonado contends that the ALJ did not properly evaluate the medical evidence related to her fibromyalgia diagnosis, which would have rendered her *per se* disabled. Pl. Mem. at 18–19. Second, Maldonado claims that the ALJ erred in his Step Three analysis because Maldonado's mental impairments met the disability requirements under Listings 12.04 and/or 12.06. *Id.* at 21–24. Third, Maldonado argues that the ALJ erred by posing hypothetical questions to the vocational expert that did not account for all of Maldonado's documented limitations, which led the ALJ to conclude that jobs were available to Maldonado when in fact they were not. *Id.* at 24–26. Finally, Maldonado alleges that the ALJ engaged in gross misbehavior during the hearings and in his analysis, which denied her due process. *Id.* at 26–28.

---

(3) ordering a consultative examination, and (4) asking others or the claimant for more information. 20 C.F.R. § 404.1520b(c). In this case, the ALJ ordered additional rheumatological and psychiatric consultative examinations during the first hearing. R. at 208–09. He issued subpoenas for updated medical records and scheduled a second hearing to allow ample time for review of the new evidence. *Id.* at 205–07, 212–13. The ALJ then scheduled a third hearing to allow the medical expert to review new evidence and base his testimony on the complete record. *Id.* at 148, 157–60. The ALJ also allowed witnesses to testify throughout the hearings, often asking them to clarify, elaborate, and explain their statements, and permitted Maldonado's counsel to cross-examine witnesses. *See, e.g.*, 87–94, 162–72, 189–213, 217. The Court has reviewed the medical evidence in the record alongside the ALJ's decision and independently concludes that the ALJ affirmatively met his duty to develop the record. *See, e.g., Pena*, 2008 WL 5111317, at *8 ("The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity.").

For the reasons set forth below, the Court rejects Maldonado's arguments and affirms the ALJ's decision.  First, the ALJ found fibromyalgia to be a medically determinable impairment, rendering Maldonado's argument moot.  He also evaluated fibromyalgia's symptoms in subsequent steps, specifically considering it in conjunction with other impairments at Step Three and considering its waxing and waning nature in his residual functional capacity assessment.  Second, the ALJ did not err in his Step Three analysis because he properly assigned "little weight" to Simmons' opinion and because his finding that Maldonado failed to satisfy Listing requirements was supported by substantial evidence.  Third, the ALJ's residual functional capacity determination was supported by substantial evidence, and he posed appropriate hypotheticals to the vocational expert that included all of Maldonado's assessed limitations.  Finally, Maldonado's allegations of ALJ bias do not require remand.

### 1. The ALJ properly evaluated Maldonado's fibromyalgia as part of the five-step sequential evaluation process.

An ALJ's finding that a claimant's fibromyalgia is a medically determinable impairment occurs at the second step of the evaluation process.  SSR 12-2p, 2012 WL 3104869, at *5.  Once the ALJ has established that the claimant's fibromyalgia is a severe impairment, the impairment and its symptoms are then considered throughout the five-step sequential evaluation process to determine if the claimant is disabled.  Id.[30]  Maldonado contends that the ALJ did not properly evaluate the

---

[30] At Step One, the Commissioner considers whether a person with fibromyalgia is engaged in substantial gainful activity.  SSR 12-2p, 2012 WL 3104869, at *5.  At

medical evidence related to her fibromyalgia because he (1) failed to find her fibromyalgia to be a medically determinable impairment under SSR 12-2p, which would have rendered her *per se* disabled; (2) failed to consider fibromyalgia in combination with Maldonado's other impairments; and (3) failed to consider fibromyalgia's waxing and waning characteristics. Pl. Mem. at 18–19. The Commissioner responds that Maldonado fails to "meaningfully explain what the ALJ failed to consider with regard to her fibromyalgia diagnosis." Def. Mem. at 22. Specifically, Maldonado's argument does not accurately characterize the ALJ's finding that Maldonado's fibromyalgia was a severe impairment. Further, the medical evidence cited by Maldonado in support of her fibromyalgia diagnosis was evaluated by the ALJ in his assessment of Maldonado's residual functional capacity, and his ultimate determination that Maldonado was not disabled.

---

Step Two, the Commissioner considers the claimant's symptoms to determine whether the claimant's fibromyalgia is severe. *Id.* At Step Three, the Commissioner determines whether the claimant's fibromyalgia "medically equals a Listing (for example, Listing 14.09D for inflammatory arthritis), or whether it medically equals a Listing in combination with at least one other medically determinable impairment." *Id.* at *6. Then, in evaluating the claimant's residual functional capacity, the Commissioner considers a longitudinal record of the claimant's fibromyalgia treatment and symptoms whenever possible. *Id.* At Steps Four and Five, the Commissioner uses the assessed residual functional capacity to determine if the claimant is capable of doing any past relevant work (Step Four) or any other work that exists in significant numbers in the national economy (Step Five). *Id.*

### a. Maldonado's assertion that the ALJ did not find a medically determinable impairment of fibromyalgia is moot.

Maldonado first asserts that medical evidence shows her fibromyalgia satisfied the SSR 12-2p criteria, and should have qualified as a "disabling impairment." Pl. Mem. at 18.  However, the ALJ did in fact find that she had fibromyalgia, and that it was a severe impairment, R. at 24, 26, which Maldonado later acknowledges. Pl. Mem. at 20; Pl. Reply at 2.  The ALJ did express doubts about the accuracy of Maldonado's fibromyalgia diagnosis, but nevertheless found it to be a severe medically determinable impairment.  R. at 26.  Moreover, the ALJ considered fibromyalgia, among other severe impairments, in subsequent steps when determining whether Maldonado's impairments rendered her disabled.  *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Calixte v. Colvin*, No. 14-CV-5654 (MKB), 2016 WL 1306533, at *23 (E.D.N.Y. Mar. 31, 2016). Maldonado's arguments on this point are thus moot.

### b. The ALJ's finding that Maldonado has a medically determinable impairment of fibromyalgia does not render her *per se* disabled.

Maldonado next asserts that "once an individual is found to have fibromyalgia, he or she may be said to be *per se* disabled and needs to prove nothing further." Pl. Mem. at 19; Pl. Reply at 2.  She concludes that, "since [she] fulfills the requirements of SSR 12-2p supporting a diagnosis of fibromyalgia . . . this matter should have ended with a favorable determination at Step 3 . . . ." Pl. Mem. at 29–30.  This argument misconstrues the applicable guidance on fibromyalgia.  Contrary

52

to Maldonado's argument, SSR 12-2p outlines criteria for determining whether a person has a medically determinable impairment of fibromyalgia. 2012 WL 3104869, at *2–3. SSR 12-2p explicitly states that fibromyalgia *cannot* meet a Listing in Appendix 1 of Subpart P because fibromyalgia "is not a listed impairment." *Id.* at *6. It further requires that the ALJ, after finding a medically determinable impairment of fibromyalgia, "evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." *Id.* at *5. In this Circuit, a finding of fibromyalgia as a medically determinable impairment "without a finding as to the severity of symptoms and limitations does not mandate a finding of disability." *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008). "[F]or purposes of the disability analysis, the mere diagnosis of fibromyalgia is not particularly significant; it is the severity of the fibromyalgia symptoms and the limitations caused thereby that matter most." *Lasitter v. Astrue*, No. 12-CV-112 (JMC), 2013 WL 364513, at *9 (D. Vt. Jan. 30, 2013) (citing *Green-Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir. 2003)). Though the ALJ determined that Maldonado's fibromyalgia was a severe impairment, that finding did not end the inquiry into whether Maldonado was disabled.

### c. The ALJ considered Maldonado's fibromyalgia in conjunction with other impairments at Step Three.

Maldonado alleges that the ALJ erred by not evaluating whether a "related listing could be met when fibromyalgia is considered in combination with . . . other impairments." Pl. Mem. at 18. The Commissioner counters that the ALJ did

discuss "whether [Maldonado] had an impairment or 'combination' of impairments
that met or medically equaled the severity of one of the listed impairments." Def.
Mem. at 22. The regulations state that although fibromyalgia is not a listed
impairment, the ALJ should consider whether it "medically equals a Listing (for
example, Listing 14.09D in the Listing for inflammatory arthritis), or whether it
medically equals a Listing in combination with at least one other medically
determinable impairment." SSR 12-2p, 2012 WL 3104869, at *6; *see also Flake v.
Comm'r. of Soc. Sec.*, No. 15-CV-1128 (GTS) (WBC), 2016 WL 7017355, at *6
(N.D.N.Y. Nov. 10, 2016) ("Whether Plaintiff has an impairment or combination of
impairments that meets or equals a Listing is a determination reserved for the
Commissioner"), *adopted by*, 2016 WL 7017396 (N.D.N.Y. Dec. 1, 2016); *Casselbury
v. Colvin*, 90 F. Supp. 3d 81, 92 (W.D.N.Y. 2015).

In his decision, the ALJ noted that "[Maldonado] is not subject to any
impairments, or combination of impairments, that meets or medically equals the
requirement of the Listings of Impairments." R. at 25. After finding that
Maldonado has a medically determinable impairment of fibromyalgia, the ALJ
considered multiple "relative [L]istings" in combination with Maldonado's
impairments, including Listing 1.02 (major dysfunction of a joint) and Listing 1.04
(disorders of the spine). *Id.* at 26–27. Further, in evaluating Maldonado's obesity,
the ALJ observed that "there is no evidence within the medical record that
[Maldonado's] combined impairments are greater than might be expected without
obesity." *Id.* at 27. The ALJ also reviewed Maldonado's mental impairments in

54

combination with her fibromyalgia, making reference to Dr. Tieng's opinion that

Maldonado's "pain would frequently interfere with her capacity for attention and

concentration, with a moderate limitation in her ability to deal with work stress."

*Id.* at 27–28, 629. Although the ALJ ultimately determined that Maldonado's

conditions did not meet or medically equal a Listing, he did so after considering her

fibromyalgia in combination with her other impairments. *See, e.g., Lawton v.

Astrue*, No. 08-CV-137 (LEK/DEP), 2009 WL 2867905, at *14-15 (N.D.N.Y. Sep. 2,

2009) ("From his decision . . . it is evident that . . . the ALJ did consider the

combined effect of plaintiff's impairments, with due regard to their respective

degrees of severity, when considering the question of disability.").

### d. The ALJ considered the waxing and waning nature of fibromyalgia in the residual functional capacity assessment.

Maldonado further argues that the ALJ failed to consider the "waxing and

waning" nature of fibromyalgia, Pl. Mem. at 18, or the "'good' and 'bad' days that

[Maldonado] testified to at the hearings" as part of his analysis. Pl. Reply at 1. In

cases where the claimant alleges fibromyalgia, "longitudinal records reflecting

ongoing medical evaluation and treatment from acceptable medical sources are

especially helpful in establishing both the existence and severity of the

impairment." SSR 12-2p, 2012 WL 3104869, at *3. Such records capture the

symptoms of fibromyalgia which can "wax and wane so that a person may have bad

days and good days" or "vary in severity over time." *Id.* at *5–6 (internal quotation

marks omitted); *see, e.g., Campbell v. Colvin*, No. 13-CV-451 (GLS) (ESH), 2015 WL

55

73763, at *11 (N.D.N.Y. Jan. 6, 2015) (longitudinal medical record would have shown claimant's alleged functional limitations were consistent with fibromyalgia).

The ALJ analyzed the severity of Maldonado's symptoms over time. Specifically, he asked Maldonado what constituted a "bad day" and a "good day" with regard to her pain and physical limitations. R. at 60, 64. His written decision reflects that he "evaluated all the evidence in the record in order to present a longitudinal picture of her allegations." *Id.* at 30. In assessing Maldonado's residual functional capacity, he considered Dr. Tieng's treatment notes dating back from June 8, 2011, through September 21, 2012, during which time Dr. Tieng evaluated Maldonado on a monthly and bi-monthly basis. *See, e.g., id.* at 548–53, 628–36.[31] He also reviewed the Catskill treatment notes from September 25, 2012 through September 14, 2013 where Maldonado received frequent, at times daily, treatment for her pain and Carpal Tunnel Syndrome. *Id.* at 789–843, 888–89. In addition, the ALJ referred to treatment notes by licensed clinical social workers and Maldonado's treating psychiatrists dating from March 14, 2011 through March 14, 2013. *See, e.g.*, 595–97, 703–06. The ALJ's findings thus rested on the longitudinal

---

[31] Maldonado observes that the ALJ afforded "partial weight" to Dr. Tieng's opinion, and argues that he was "picking and choosing which statements he felt were supported by the evidence of record and which were not." Pl. Mem. at 20. The ALJ generally accepted Dr. Tieng's clinical findings, and ultimately agreed with the fibromyalgia diagnosis, but rejected Dr. Tieng's estimate that Maldonado would need to be absent more than three days per month because it was "unsupported and inconsistent with Dr. Tieng's own clinical findings." R. at 32. The ALJ is permitted to afford less than controlling weight where an opinion is not supported by evidence. *Pena ex rel. E.R.*, 2013 WL 1210932, at *15; *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

56

picture provided by the medical evidence and treating physicians, and captured the

waxing and waning nature of fibromyalgia. *See, e.g., Cabibi v. Colvin*, 50 F. Supp.

3d 213, 235 (E.D.N.Y. Aug. 28, 2014) ("SSR 12–2p recognized the importance of

relying on the opinion of a . . . treating source [that] would have the longitudinal

picture of a claimant's impairments, especially given the fact that fibromyalgia

often involves varying signs and symptoms."). In sum, the ALJ properly evaluated

the "intensity and persistence" of Maldonado's symptoms when determining what

impact her fibromyalgia had on her residual functional capacity. *See* SSR 12-2p,

2012 WL 3104869, at *6; *see also Rivers*, 280 F. App'x at 22 ("fibromyalgia is a

disease that eludes [objective] measurement, [and] mere diagnosis of fibromyalgia

without a finding as to the severity of symptoms and limitations does not mandate a

finding of disability") (internal quotation marks omitted).

### 2.  The ALJ's Step Three findings as to Maldonado's mental impairments are supported by substantial evidence.

Maldonado contends the ALJ should have afforded controlling weight to

Simmons' opinion. Pl. Mem. at 23. Had Simmons' opinion been assigned greater

weight, Maldonado claims, the ALJ would have found that Maldonado's depression

and anxiety meet the requirements under Listing 12.04 and Listing 12.06. *Id.*

Maldonado further argues that Dr. Mahony's opinion, which indicated that

Maldonado had "so many impairments," should have established that her mental

impairments meet the Listings. Pl. Mem. at 22; *see also* Pl. Reply at 3–4. After a

review of the record, the Court finds that the ALJ properly assigned "little weight"

to Simmons' opinion and that substantial evidence supports the ALJ's conclusion

that Maldonado's mental impairments do not meet or medically equal Listing 12.04 or Listing 12.06.

### a. The ALJ properly assigned little weight to Simmons' opinion.

Maldonado argues that the ALJ failed to give Simmons' opinion controlling weight as Maldonado's treating psychotherapist. Pl. Mem. at 23. The Commissioner responds that the ALJ properly rejected Simmons' report as it was inconsistent with the evidence in the record. Def. Mem. at 22. The Second Circuit has held that, "[i]n order to override the opinion of the treating physician, . . . the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. Social workers and therapists are not "acceptable medical sources" for purposes of establishing an impairment. 20 C.F.R. § 404.1513(a). Accordingly, their opinions are not entitled to controlling weight. *See, e.g., Pogozelski v. Barnhart,* No. 03-CV-2914 (JG), 2004 WL 1146059, at *12 (E.D.N.Y. May 19, 2004) (therapist is "not a physician, and thus not entitled to the level of deference accorded under the 'treating physician rule'"). Nevertheless, social workers and therapists are "other sources" whose opinions can be considered to evaluate "the severity of [an] impairment[ ] and how it affects [a claimant's] ability to work." 20 C.F.R. § 404.1513(d).

Opinions from these sources are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06–03p, 2006 WL

58

2329939, at *3 (SSA Aug. 9, 2006); *see also Longbardi v. Astrue,* No. 07-CV-5952

(LAP) (MHD), 2009 WL 50140, at *31 (S.D.N.Y. Jan. 7, 2009) (clinical social

worker's opinion is "relevant on the issue of the intensity and persistence of

plaintiff's functional symptoms . . . and hence the ultimate disability

determination"); *Allen v. Astrue,* No. 05-CV-101 (NAM) (GJD), 2008 WL 660510, at

*9 (N.D.N.Y. Mar. 10, 2008) (remanding in part because ALJ did not evaluate

treating therapist's opinion).  The same factors for the evaluation of the opinions of

"acceptable medical sources" are used to evaluate the opinions of licensed social

workers.  SSR 06-03p, 2006 WL 2329939, at *4; *see also* 20 C.F.R. § 404.1527(c).

Courts have remanded cases where the ALJ disregards the opinion of a licensed

clinical social worker "simply because it was the opinion of a social worker, not on

account of its content or whether it conformed with other evidence in the record."

*Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010); *see also*

*Gillies v. Astrue*, No. 07-CV-517 (MAT), 2009 WL 1161500, at *6 (W.D.N.Y. Apr. 29,

2009); *Figueroa v. Astrue*, No. 04-CV-7805 (KMK) (LMS), 2009 WL 4496048, at *12

(S.D.N.Y. Dec. 3, 2009).

The ALJ considered all of the relevant factors in assigning Simmons' opinion

"little weight," and did not base his rejection of the opinion on her lack of a medical

degree alone.  First, he noted that Simmons was a licensed social worker, who

"provided psychotherapy [to Maldonado] during the period at issue."  R. at 36; *see*

*also* 20 C.F.R. § 404.1527(c)(1)–(2), (5).  Second, the ALJ noted that Simmons did

not present relevant evidence in her Medical Source Statement to support her

opinion, "particularly medical signs and laboratory findings." R. at 36; see also 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). The ALJ observed that Simmons' opinion seemed to be based solely on Maldonado's subjective complaints rather than on objective findings. Id. at 36. Simmons' Medical Source Statement confirms the ALJ's observation, because whenever she had the opportunity to explain the factors that supported her assessment, Simmons listed Maldonado's subjective reports and complaints, but never cited objective medical signs or findings. Id. at 637–38, 645–47.

Finally, the ALJ noted that Simmons' opinion was inconsistent with the medical evidence in the record as a whole; her conclusions contradicted her own treatment notes, other treating physicians' notes, and other evidence in the record. R. at 36; see also 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Simmons' treatment notes consistently documented that Maldonado displayed normal affect, normal speech, and full orientation. See, e.g., R. at 561, 577, 593. She assessed Maldonado's GAF score at 58 throughout treatment. See, e.g., id. at 515, 588, 606. She further found that Maldonado's memory, concentration, and attention were intact. See, e.g., id. at 562, 568, 571, 574.[32]

---

[32] Simmons noted Maldonado's memory, concentration, and attention to be minimally impaired only three times over a two year period. R. at 565, 577, 605.

These notes contradict her Medical Source Statement, which indicated that Maldonado had marked limitations in daily living, social functioning, and work-related functions. *Id.* at 648. For example, to explain her assessment that Maldonado's mental abilities were seriously limited, Simmons' Medical Source Statement contends that Maldonado missed medical appointments due to forgetfulness. *Id.* at 646. However, Simmons had consistently found that Maldonado's memory was intact, *see, e.g., id.* at 562, 574, and the ALJ cited to evidence showing that Maldonado missed medical appointments due to other appointments and lack of childcare—not that she forgot to attend. *Id.* at 36. Additionally, Simmons' opinion was inconsistent with Dr. Spiegel's, who co-signed the Medical Source Statement, and consistently assessed Maldonado's mental state as "normal." *Id.* at 703–04, 711–12. Accordingly, the ALJ properly declined to give Simmons' opinion greater weight based on the lack of medical evidence it presented and its inconsistency with the record. *See Figueroa*, 2009 WL 4496048, at \*12 (ALJ properly rejected opinion of treating non-physician because it was "contradicted by the opinion of the consultative physician, . . . by the claimant's conservative course of treatment, by the objective medical findings of record, and by the claimant's wide range of daily activities").

### b. The ALJ's finding that Maldonado's mental impairments do not medically equal Listings 12.04 or 12.06 is supported by substantial evidence.

Maldonado further argues that her mental impairments medically equal Listings 12.04 and/or 12.06 because she has "marked" limitations in 10 work-related

61

functions, according to Simmons' opinion. Pl. Mem. at 23. Maldonado also disputes the ALJ's interpretation of Dr. Mahony's opinion, arguing that he found "so many impairments . . . even if mild or moderate," that the ALJ should have therefore found that Maldonado's depression and anxiety disorders meet or medically equal the listed impairments. Pl. Mem. at 22; *see also* Pl. Reply at 3–4.[33] The Commissioner counters that, while Maldonado may have exhibited some of the required symptoms, she did not demonstrate that her impairments equaled either Listing 12.04 or 12.06. Def. Mem. at 28–30. The Commissioner further argues that Dr. Mahony's findings regarding Maldonado's mild to moderate limitations do not preclude her from work. *Id.* at 25–26.

A depressive disorder or an anxiety-related disorder meets Listing 12.04 or 12.06, respectively, if it satisfies the "paragraph B" or "paragraph C" criteria under each Listing. *See* 20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶ 12.00. Maldonado's argument implies that her impairments meet the "paragraph B" criteria for the Listings, and therefore satisfy the requirements for both Listings. *See* Pl. Mem. at 23. Under the regulations in effect at the time of the decision, "paragraph B" criteria for both Listings were the same, and required that an impairment result in at least two of the following: marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining

---

[33] Maldonado does not contest the "significant weight" afforded to Dr. Mahony's opinion. The ALJ noted that Dr. Mahony's findings are well supported by the record and are consistent with the findings of Maldonado's treating psychiatrists, Dr. Frenkel and Dr. Spiegel. R. at 38.

concentration, persistence, or pace; or repeated episodes of decompensation, or diminished functioning, each of extended duration.  20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶¶ 12.04(B), 12.06(B).

The regulations define "marked" as "more than moderate but less than extreme."  20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶¶ 12.00(C).  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.*  As previously discussed, the ALJ properly afforded "little weight" to Simmons' report, and therefore her determination that Maldonado had marked limitations in 10 function areas was not controlling.  In his decision, the ALJ found that Maldonado had moderate difficulties in activities of daily living, no difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration.  R. at 27–28.

The ALJ first evaluated Maldonado's ability to perform activities of daily living, finding that the outpatient treatment she received was inconsistent with her alleged limitations.  *Id.* at 27.  He also found Maldonado's ability to care for her child indicated a less than marked limitation in this area.  *Id.*  The record supports the ALJ's finding that Maldonado was able to help in caring for her young child and was able to perform light housework.  *See, e.g., id.* at 142, 394, 520, 767.  The ALJ also evaluated Maldonado's social functioning and concluded that there is no

evidence to support Maldonado's alleged limitations in this area. *Id.* at 27. The record shows that she attended church with relatives and shopped with her daughters. *Id.* at 141–43, 167–68. She was also cooperative with her physicians and treatment providers. *See, e.g., id.* at 399, 584, 593, 607.

With regard to Maldonado's moderate difficulties in maintaining concentration, persistence, or pace, the ALJ cited Dr. Pelczar-Wissner's report, which noted that Maldonado was able to provide the names and telephone numbers of her treating physicians. *Id.* at 27. He referred to Dr. Tieng's report, which indicated that she was only moderately limited in her ability to deal with work-related stress. *Id.* at 28. The ALJ further supported his finding by referring to the reports of Maldonado's mental-health providers and examiners, who all assigned a GAF score of 55, 58, or 60 throughout her treatment period, which indicates only moderate symptoms. *Id.*; *see* DSM–IV–TR at 34. The record supports the ALJ's assessment, as Simmons found that Maldonado's memory, attention, and concentration were limited or minimally impaired at only three appointments; otherwise they were intact. R. at 565, 577, 605. The ALJ also found that the record lacked evidence of an increase in severity of Maldonado's symptoms, a change in medication, or the need for a more structured psychological support system, and therefore found no evidence of any episodes of decompensation. *Id.* at 28.

Maldonado makes no substantive arguments that she had "marked limitations" in any of the three areas or that she experienced repeated episodes of decompensation as required under "paragraph B" criteria. Additionally, she has not

64

cited any authority for the notion that the ALJ must find her disabled simply due to the number of impairments discussed by Dr. Mahony, "even if mild or moderate." Pl. Mem. at 22. Indeed, the text of the Listings contradicts that assertion. 20 C.F.R. § Pt. 404, Subt. P, App. 1, ¶¶ 12.04(B), 12.06(B). Although Dr. Mahony documented difficulties in seven work-related areas, his findings indicated only mild to moderate restrictions for Maldonado, which is consistent with the ALJ's conclusion. *See, e.g., Perez v. Colvin*, No. 14-CV-9733 (VB) (JCM), 2016 WL 5956393, at *10 (S.D.N.Y. Jul. 21, 2016) (affirming ALJ's determination that claimant did not meet "paragraph B" criteria because substantial evidence supported only mild to moderate difficulties and no episodes of decompensation), *adopted by*, 2016 WL 5942314 (S.D.N.Y. Oct. 11, 2016). Accordingly, the ALJ's determination that Maldonado's impairments do not satisfy "paragraph B" criteria was supported by substantial evidence, and she thus did not meet the requirements under Listings 12.04 or 12.06.

### 3. The ALJ properly posed hypotheticals to the vocational expert.

Maldonado contends that the hypothetical questions posed by the ALJ to the vocational expert "omitted significant limitations supported by the record and contained assumptions not supported by substantial evidence." Pl. Mem. at 25. Specifically, Maldonado argues that the ALJ's hypotheticals did not consider her moderate difficulties in concentration, persistence, and pace; her documented symptoms of mood disturbances such as anhedonia, decreased energy, anxiety, emotional withdrawal, and isolation; and the limitations to her hand caused by her

65

Carpal Tunnel Syndrome. *Id.* Maldonado reasons that failure to account for these limitations led the ALJ to inflate the number of jobs that were available to her. *Id.* The Commissioner counters that the ALJ needed only to describe the limitations Maldonado credibly established in his hypotheticals. Def. Mem. at 31.

The ALJ "may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence." *Mancuso v. Astrue*, 361 Fed. App'x. 176, 179 (2d Cir. 2010). The ALJ need not "include in his hypothetical question symptoms and limitations that [the ALJ] had reasonably rejected." *Priel v. Astrue*, 453 F. App'x 84, 87–88 (2d Cir. 2011) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)). The ALJ's hypotheticals were limited to work requiring only simple tasks and instructions. R. at 104–05. Further, the ALJ reviewed the medical evidence regarding Maldonado's Carpal Tunnel Syndrome and found it to be inconsistent with her description of her limitations. *Id.* 39–40. As such, the ALJ limited his hypotheticals to work requiring only frequent but not continuous manipulative activities. *Id.* at 104–05. These hypotheticals mirror the ALJ's residual functional capacity assessment, *id.* at 29, which is supported by substantial evidence, and were thus appropriate.

### a. The ALJ accounted for Maldonado's difficulties in concentration, persistence, and pace.

Maldonado argues that the ALJ's assessment of her residual functional capacity lacked limitations concerning Maldonado's inability to be productive. Pl. Mem. at 24–26. In his decision, the ALJ did account for Maldonado's difficulties in

66

concentration, persistence, and pace, but he simply found them to be less restrictive than Maldonado alleges. He cited the opinions of Dr. Alerte, which were "generally consistent with [his] finding that the claimant can perform adequately at a simple task/instruction job." R. at 37–38. Dr. Alerte found that Maldonado could be expected to perform at an 80 percent efficiency rate despite her mental impairments. *Id.* at 895. In a regular work day, Maldonado's mental impairments would cause her to be "off-task" 10 percent of the time or less, and only preclude her from performing mental tasks five percent of the time. *Id.* at 893–94. He also estimated that Maldonado would likely be absent or unable to complete a full work day for only two days or less as a result of her impairments. *Id.* Accordingly, at the hearing, the ALJ posed hypotheticals to the vocational expert that limited Maldonado to work that involved only simple tasks and instructions. *Id.* at 104–05. He also included in his hypothetical that the person "could be off task for up to 10 percent of the time." *Id.* at 106–07.

### b. The ALJ considered Maldonado's documented symptoms of mental impairments.

Maldonado next alleges that the ALJ's hypotheticals did not account for her documented conditions relating to her mood, such as anhedonia, decreased energy, anxiety, mood disturbance, emotional withdrawal, and isolation. Pl. Mem. at 25. In his decision, the ALJ considered these symptoms by citing Dr. Mahony's findings, which were "generally consistent with [his] finding that the claimant can perform adequately at a simple task/instruction job." R. 37–38. Dr. Mahony assigned mild limitations on Maldonado's ability to relate to others and deal with stress. *Id.* at

67

785. He indicated that Maldonado was moderately limited in her abilities to interact with others in a work setting, *id.* at 786, but that her condition "[did] not seem to interfere with [her] ability to function on a daily basis." *Id.* at 783. As stated above, the ALJ posed hypotheticals that limited Maldonado to jobs with simple tasks and instructions to account for these findings. *Id.* at 104–05.

### c. The ALJ's hypotheticals accounted for Maldonado's hand limitations.

Finally, Maldonado asserts that the ALJ failed to include appropriate limitations in his hypotheticals that reflect her Carpal Tunnel Syndrome.[34] The ALJ did consider Dr. Tieng's opinion and Catskill treatment notes, which documented "[Maldonado's] allegations of pain and the findings of moderate Carpal Tunnel Syndrome." *Id.* at 41. However, the ALJ cast doubt upon the credibility of Maldonado's statements regarding the severity of her hand limitations, and her testimony more generally. *Id.* at 39–41.

In assessing a claimant's credibility, the reviewing court must defer to the ALJ's decision to discount a claimant's complaints of pain as long as the "'findings are supported by substantial evidence.'" *Vargas*, 2011 WL 2946371, at *11 (quoting *Aponte*, 728 F.2d at 591). Such findings must "be set forth with sufficient specificity

---

[34] In her brief, Maldonado additionally asserts that she meets Listing 1.02 due to "severe bilateral wrist-hand pain and limitation of motion throughout the relevant period." Pl. Mem. at 24. However, she fails to cite any specific medical evidence in the record or any legal authority to support this one-sentence argument. The ALJ considered Listing 1.02 in combination with fibromyalgia in his Step Three analysis, but found she did not meet the listed requirements. R. at 26. Moreover, the ALJ considered her Carpal Tunnel Syndrome in his residual functional capacity assessment. *Id.* at 41.

68

to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (quoting *Williams*, 859 F.2d at 260–61).

The ALJ pointed out multiple inconsistencies between Maldonado's allegations and the medical evidence in the record, as well as examples of contradictions within Maldonado's own testimony. R. 39–40. With regard to Maldonado's hand limitations, the ALJ pointed out that "[i]nconsistent with [her] allegations of inability to lift or carry a gallon of milk, Dr. Teing opined that she could constantly lift and carry up to five pounds and could frequently lift and carry up to ten pounds and occasionally lift and carry up to 20 pounds." *Id.* at 40. He also noted that, according to Dr. Tieng, Maldonado could "frequently" use her hands for reaching, handling, and fingering. *Id.* Further, the ALJ cited Dr. Pelczar-Wissner's findings that Maldonado's "hand and finger dexterity were intact with grip strength of 5/5 bilaterally." *Id.* at 41. The Court thus defers to the ALJ's determination regarding Maldonado's Carpal Tunnel Syndrome because the ALJ presented his findings with the level of specificity required to discount Maldonado's credibility.

Based on his assessment of the medical evidence, the ALJ limited Maldonado to work involving "frequent but not continuous manipulative activities considering her allegations of pain and the findings of moderate Carpal Tunnel Syndrome." *Id.* Accordingly, the ALJ's hypothetical appropriately limited Maldonado to work that required "frequent but not continuous reaching, handling, fingering, and feeling." *Id.* at 104–105.

69

### d. The hypotheticals matched the ALJ's residual functional capacity assessment, which is supported by substantial evidence.

At the hearing, the ALJ posed hypotheticals to the vocational expert for a hypothetical person who could "do the full range of sedentary work," but was "limited to simple instructions and tasks," "frequent but not continuous reaching, handling, fingering, and feeling," and "occasional pushing and pulling." R. at 104–05. He also included in his hypotheticals that the person "could be off task for up to 10 percent of the time and . . . absent . . . up to and including one day a month on average due to severe impairment . . . ." *Id.* at 106–07. The hypotheticals the ALJ posed to the vocational expert mirrored his residual functional capacity assessment, which included the same description of Maldonado's abilities. *See id.* at 29. Contrary to Maldonado's assertion, the ALJ appropriately utilized hypotheticals, because they relied on his residual functional capacity determination, which was supported by substantial evidence. *See Mancuso*, 361 Fed. App'x. at 179 ("The [claimant's] argument [that the hypothetical provided to the vocational expert failed accurately to reflect her impairments] fails because the ALJ's hypothetical mirrored [the claimant's residual functional capacity], which. . . was supported by substantial evidence in the record."). Therefore, the ALJ's hypotheticals were appropriate and the ALJ properly relied on the vocational expert's testimony.

### 4. Maldonado has not met her burden in alleging bias and thus remand is not warranted.

Finally, Maldonado accuses the ALJ of denying her due process because of his "gross misbehavior" during the hearings and in his analysis. Pl. Mem. at 26–28.

70

She argues that the ALJ's decision and the errors therein demonstrate his "mean-spiritedness, spite, and deliberate flouting of SSA procedures." *Id.* at 27. She further alleges that the ALJ "asked leading questions," and cut off testimony when he did not like what was being said. *Id.* The Commissioner responds that a district court does not have the authority to conduct a trial or independent fact-finding on allegations of ALJ bias, and that Maldonado has not availed herself of the agency procedures for handling bias complaints. Def. Mem. at 33–34. Moreover, the Commissioner argues that Maldonado has not met her burden of proof in demonstrating that the ALJ engaged in conduct so extreme that it deprived the hearing of fundamental fairness mandated by due process. *Id.* Maldonado essentially abandons the claim in her reply by explaining that she does not seek to re-litigate the question of ALJ bias before the Court; she simply "lays bare" questionable conduct by the ALJ so that the Court may "observe the irrelevant non-issues" raised by the ALJ. Pl. Reply at 5.

The Commissioner's threshold arguments that the Court is unable to review an ALJ's decision for bias are unpersuasive. "[I]n most instances, a claim must be raised at the administrative level before a reviewing court may consider it." *Kendrick v. Sullivan*, 784 F. Supp. 94, 99 (S.D.N.Y. 1992) (citing *Correa v. Thornburgh*, 901 F.2d 1166, 1171 (2d Cir. 1990)). However, courts in this Circuit have held that "[t]he failure to raise [the issue of ALJ bias] to the Appeals Council is not jurisdictional and does not preclude this Court from reviewing Plaintiff's claim of bias." *Trimm v. Colvin*, No. 7:13-CV-00961 (MAD), 2015 WL 1400516, at *4

71

(N.D.N.Y. Mar. 26, 2015); *see also Pronti v. Barnhart*, 339 F. Supp. 2d 480, 495 (W.D.N.Y. 2004); *Kendrick*, 784 F. Supp. at 99. Further, Maldonado did file a request for review with the Appeals Council on the basis of the ALJ's "abuse of discretion, meanspiritedness, combativeness and inflammatory allegations," R. at 15, which was denied because the Appeals Council found that "there was no abuse of discretion" by the ALJ. *Id.* at 6. Maldonado therefore raised the issue of bias at "the earliest opportunity," as required by 20 C.F.R. § 404.940. *See Pronti*, 339 F. Supp. 2d at 495.

As "Social Security proceedings are inquisitorial rather than adversarial," *Sims*, 530 U.S. at 110–11, "the outcome of a proceeding may fairly be questioned when an ALJ displays 'deep-seated favoritism or antagonism that would make a fair judgment impossible.'" *Pabon v. Comm'r of Soc. Sec.*, No. 14-CV-1954 (PAE) (FM), 2015 WL 4620047, at *5 (S.D.N.Y. Aug. 3, 2015) (quoting *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 119 (2d Cir. 1999)), *report and recommendation adopted sub nom. Pabon v. Colvin*, No. 14-CV-1954 (PAE), 2015 WL 5319265 (S.D.N.Y. Sept. 11, 2015). "ALJs, however, are presumed to be unbiased, and to exercise their decision-making authority with honesty and integrity." *Id.* (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) (citations omitted). "This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *see, e.g., Poles v. Colvin*, No. 14-CV-06622 (MAT), 2015 WL 6024400, at *2 (W.D.N.Y. Oct. 15, 2015) ("Comments indicating the appearance of [the ALJ's] bias

72

against Plaintiff based on her history of incarceration and drug use are evident throughout his decision."); *McAninch v. Astrue*, No. 09-CV-0969 (MAT), 2011 WL 4744411, at *18 (W.D.N.Y. Oct. 6, 2011) ("questionnaires sent by the ALJ demonstrate that the ALJ took on an extremely adversarial stance" and "amount to the ALJ conducting a 'cross-examination' of the Plaintiff's medical providers without affording Plaintiff or his attorney an opportunity to be present").

After closely reviewing the record, the Court finds that the hearing transcripts do not corroborate Maldonado's descriptions of the ALJ's conduct, nor the antagonism required to remand on the basis of ALJ bias. Maldonado alleges that the ALJ did not consider "any relevant factor" in determining her credibility because he "repeatedly ask[ed] the same questions" about her work history. Pl. Mem. at 28. First, as discussed above, the ALJ stated with sufficient specificity the reasons that Maldonado's testimony was inconsistent with evidence in the record, including her testimony that "she worked for the last time in June 2009" but later "admitted to working as a baby sitter." R. at 40. This statement also contradicts her allegation that her conditions "render her unable to work." *Id.* Second, though the ALJ may have asked repetitive questions, the repetition appears to owe to Maldonado's inability to provide details or consistent answers that would allow the ALJ to assess when she last worked, which was a relevant line of inquiry. *See, e.g.*, R. at 55 (June 2009; later, 2011), 125–26 (2009; later, 2011), 192 (April 2011), 344 (June 2009), 348 (June 1, 2009). Detailed questioning by the ALJ in and of itself is not enough to establish bias. *See, e.g.*, *Battaglia v. Astrue*, No. 11-CV-02045 (BMC),

2012 WL 1940851, at *11 (E.D.N.Y. May 29, 2012) ("ALJ's questions and 'interruptions' generally served to clarify the testimony and the issues to be decided, and did not demonstrate a clear bias or inability to adjudge plaintiff's disability claim fairly.").

Maldonado additionally makes a broader argument that the ALJ asked "leading questions" and "cut[ ] off the testimony" of the witnesses, though she does not cite to any specific instances where this allegedly occurred. Pl. Mem. at 27. A review of the record reveals that, the few times that the ALJ did interrupt testimony, *see, e.g.*, R. at 149–50, 175, he "intended to further—not disrupt—the fact finding process." *Pabon*, 2015 WL 4620047, at *7 ("even if another form of questioning might have been more desirable, [claimant] has not overcome the presumption that [the ALJ] was unbiased and fair"). Moreover, a review of the transcripts reveals that Maldonado's counsel never objected to the interruptions. Additionally, the ALJ frequently asked Maldonado's counsel if she had further questions for the witnesses, and only moved on when she declined. *See, e.g.*, R. at 133, 145, 154, 213. The few times that Maldonado's counsel was interrupted while questioning witnesses, the ALJ intended to clarify the witness' testimony, and he always let counsel continue her examination after doing so. *See, e.g., id.* at 116–17, 134–35, 214–16.

The ALJ's attempts to clarify testimony in the interest of understanding the relevant facts, coupled with his allowing Maldonado's counsel to cross-examine witnesses, demonstrate that remand is not warranted due to the ALJ's bias. *See,*

*e.g., Delucia v. Colvin*, No. 15-CV-6029 (MWP), 2016 WL 898836, at \*20 (W.D.N.Y. Mar. 9, 2016). In sum, Maldonado's conclusory allegations do not meet the "difficult burden" faced by a claimant alleging a due process challenge to the ALJ's decision. *Pabon*, 2015 WL 4620047, at \*5; *see also Aden v. Barnhart*, No. 01-CV-5170 (LAK), 2003 WL 21361723, at \*3 (S.D.N.Y. June 12, 2003) ("[I]t was plaintiff's burden to bring that [issue] to the attention of the Appeals Council. Instead, she confined herself to conclusory characterizations.").

## III.   CONCLUSION

Although the Court recognizes that Maldonado suffers from many serious ailments, it is not for the Court to reject the ALJ's decision as long as it is supported by substantial evidence. Indeed, the Commissioner's decision must be upheld if it is supported by substantial evidence, "even if substantial evidence also supports the contrary result." *Ventura v. Barnhart*, No. 04-CV-9018 (NRB), 2006 WL 399458, at \*3 (S.D.N.Y. Feb. 21, 2006); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Here, the ALJ developed a significant record by presiding over three hearings, requesting subpoenas for updated medical records, and ordering additional consultative examinations. He wrote an extensive, detailed decision and properly applied the regulations to reach his final determination. Although Maldonado's impairments may be severe, the Court may not substitute its own judgment for that of the Commissioner, and finds no basis on the record presented to disturb the ALJ's conclusion that she is not

disabled. Accordingly, Maldonado's motion for judgment on the pleadings is denied

and the Commissioner's cross-motion is granted.

The Clerk of the Court is directed to close docket entries 20 and 24, and to

enter judgment for the Commissioner.

**SO ORDERED.**

Dated: March 10, 2017
New York, New York

JAMES L. COTT
United States Magistrate Judge